**08 C 730**

**JUDGE KENNELLY**
**MAGISTRATE JUDGE ASHMAN**

# Exhibit B

# Part 1

LOAN AND SECURITY AGREEMENT

by and among

BRIDGE HEALTHCARE FINANCE, LLC,
as Revolving Loan Administrative Agent,

BRIDGE OPPORTUNITY FINANCE, LLC,
as Term Loan Administrative Agent,

THE FINANCIAL INSTITUTIONS FROM TIME TO TIME A PARTY HERETO,
as Lenders,

CLC OF BILOXI, LLC, d/b/a BILOXI CLC, a Mississippi limited liability company,
CLC OF BOONEVILLE, LLC, d/b/a LONGWOOD CLC, a Mississippi limited liability
company,
CLC OF DRESDEN, LLC, d/b/a HILLVIEW CLC, a Tennessee limited liability company,
CLC OF DYERSBURG, LLC, d/b/a OAKWOOD CLC, a Tennessee limited liability
company,
CLC OF FULTON, LLC, d/b/a COURTYARDS CLC, a Mississippi limited liability
company,
CLC OF HUMBOLDT, LLC, d/b/a BAILEY PARK CLC, a Tennessee limited liability
company,
CLC OF IUKA, LLC, d/b/a TISHOMINGO CLC, a Mississippi limited liability company,
CLC OF JACKSON, LLC, d/b/a PLEASANT HILLS CLC, a Mississippi limited liability
company,
CLC OF LAKE PROVIDENCE, LLC, d/b/a LAKE PROVIDENCE SUBACUTE
REHABILITATION CENTER, a Mississippi limited liability company,
CLC OF LAUREL, LLC, d/b/a LAURELWOOD CLC, a Mississippi limited liability
company,
CLC OF LEXINGTON, LLC, d/b/a BRIARWOOD CLC, a Tennessee limited liability
company,
CLC OF LIBERTY, LLC, a Mississippi limited liability company,
CLC OF MANCHESTER, LLC, d/b/a CRESTWOOD CLC, a Tennessee limited liability
company,
CLC OF MERIDIAN, LLC, d/b/a MERIDIAN CLC, a Mississippi limited liability
company,
CLC OF OCEAN SPRINGS, LLC, d/b/a SUNPLEX SUBACUTE CENTER, a Mississippi
limited liability company,

CLC OF PASCAGOULA, d/b/a PLAZA CLC, a Mississippi limited liability company,
CLC OF RIPLEY, LLC, d/b/a LAUDERDALE CLC, a Tennessee limited liability
company,
CLC OF VAIDEN, LLC, a Mississippi limited liability company,
CLC OF WEST POINT, LLC, d/b/a WEST POINT CLC, a Mississippi limited liability
company,
CLC OF WHITEHAVEN, LLC, d/b/a WHITEHAVEN CLC, a Tennessee limited liability
company,
and
COMMUNITY LIVING CENTERS, LLC, a Mississippi limited liability company,

as Borrowers,

and

THE OTHER CREDIT PARTIES

Dated as of October 27, 2006

CHICAGO/#1492002.8

**Table of Contents**

| | | | Page |
|---|---|---|---|
| 1. | | DEFINITIONS | 2 |
| | (a) | Defined Terms | 2 |
| | (b) | Accounting Terms | 2 |
| | (c) | Terms Defined in UCC | 2 |
| | (d) | Other Definitional Provisions; Construction | 2 |
| | (e) | References to Agreements, Enactments, Etc. | 3 |
| 2. | | LOANS | 3 |
| | (a) | Revolving Loans | 3 |
| | (b) | Term Loan A | 6 |
| | (c) | Term Loan B | 7 |
| | (d) | Repayments | 9 |
| | (e) | Notes | 12 |
| 3. | | LETTERS OF CREDIT | 12 |
| | (a) | General Terms | 12 |
| | (b) | Requests for Letters of Credit | 12 |
| | (c) | Obligations Absolute | 12 |
| | (d) | Expiration Dates of Letters of Credit | 13 |
| | (e) | Participation | 13 |
| 4. | | INTEREST, FEES AND CHARGES | 14 |
| | (a) | Interest Rate | 14 |
| | (b) | Fees and Charges | 14 |
| 5. | | SETTLEMENTS, DISTRIBUTIONS AND APPORTIONMENT OF PAYMENTS | 17 |
| | (a) | Settlements | 17 |
| | (b) | Application of Payments | 18 |
| | (c) | Application of Collateral Proceeds | 18 |
| | (d) | Direct Lender Payments | 20 |
| | (e) | Defaulting Lender | 21 |
| 6. | | COLLATERAL | 21 |
| | (a) | Grant of Security Interest to Agents | 21 |
| | (b) | Lien Priority | 23 |
| | (c) | Separate Grants of Security and Separate Classification | 23 |

i

**Table of Contents**

Page

(d)   Other Security ........................................................................................ 25
(e)   Possessory Collateral ............................................................................. 25
(f)   Electronic Chattel Paper ......................................................................... 25
(g)   Letter-of-Credit Rights ........................................................................... 26
(h)   Third-Party Collateral ............................................................................. 26
(i)   Deposit Account ...................................................................................... 26
(j)   Insurance Proceeds ................................................................................. 26
(k)   Mortgages ............................................................................................... 26

7.   PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY
INTERESTS THEREIN; POSSESSION OF COLLATERAL ..................................... 27

8.   COLLECTIONS .......................................................................................... 28

9.   COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND
SCHEDULES ............................................................................................. 30

(a)   Borrowing Base Reports ......................................................................... 30
(b)   Reserved .................................................................................................. 30
(c)   Monthly Reports ..................................................................................... 30
(d)   Cost Reports ............................................................................................ 30
(e)   Financial Statements ............................................................................... 30
(f)   Annual Projections .................................................................................. 31
(g)   Explanation of Projections ...................................................................... 31
(h)   Invoices and Billing Statements .............................................................. 31
(i)   Obligor Financial Statements and Tax Returns ....................................... 31
(j)   Bankruptcy Payments ............................................................................. 31
(k)   Audited Balance Sheet ............................................................................ 32
(l)   Other Information .................................................................................... 32

10.   TERMINATION; AUTOMATIC RENEWAL; EARLY TERMINATION ................... 32

11.   REPRESENTATIONS AND WARRANTIES ...................................................... 33

(a)   Financial Statements and Other Information ........................................... 33
(b)   Locations; Certain Collateral .................................................................. 34
(c)   Loans by Borrower .................................................................................. 34
(d)   Accounts and Inventory .......................................................................... 34
(e)   Liens ........................................................................................................ 34

CHICAGO/#1492002.8

**Table of Contents**

|  |  | Page |
|---|---|---|
| (f) | Organization, Authority and No Conflict | 34 |
| (g) | Litigation | 35 |
| (h) | Compliance with Laws and Maintenance of Permits | 35 |
| (i) | Affiliate Transactions | 35 |
| (j) | Names and Trade Names | 35 |
| (k) | Equipment | 35 |
| (l) | Enforceability | 36 |
| (m) | Solvency | 36 |
| (n) | Indebtedness | 36 |
| (o) | Margin Security and Use of Proceeds | 36 |
| (p) | Parent, Subsidiaries and Affiliates | 36 |
| (q) | No Defaults | 36 |
| (r) | Employee Matters | 37 |
| (s) | Intellectual Property | 37 |
| (t) | Environmental Matters | 37 |
| (u) | ERISA Matters | 37 |
| (v) | Eligible Accounts | 37 |
| (w) | Reimbursement; Nongovernmental Payors | 40 |
| (x) | Compliance with Healthcare Regulations | 41 |
| (y) | Other Healthcare Regulatory Matters | 43 |
| (z) | Licenses, Permits, Etc. | 43 |
| (aa) | Healthcare Authorizations | 43 |
| (bb) | HIPAA Compliance | 44 |
| (cc) | Collective Enterprise | 44 |
| (dd) | Subordinated Debt | 44 |
| (ee) | Investment Company Act | 45 |
| 12. | AFFIRMATIVE COVENANTS | 45 |
| (a) | Maintenance of Records | 45 |
| (b) | Notices | 45 |
| (c) | Compliance with Laws and Maintenance of Permits | 49 |
| (d) | Inspection and Audits | 49 |
| (e) | Insurance | 49 |

iii

**Table of Contents**

**Page**

(f)    Collateral.........................................................................................................51

(g)    Use of Proceeds..............................................................................................51

(h)    Taxes..............................................................................................................51

(i)    Intellectual Property........................................................................................52

(j)    Government Contracts.....................................................................................52

(k)    Billing and Collection System ........................................................................52

(l)    Chief Financial Officer....................................................................................53

(m)    Corporate Compliance Program .....................................................................53

(n)    Regulatory Covenants.....................................................................................53

13.    NEGATIVE COVENANTS ........................................................................................55

(a)    Indebtedness...................................................................................................55

(b)    Liens...............................................................................................................55

(c)    Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business ....................................................................55

(d)    Dividends and Distributions ...........................................................................56

(e)    Investments; Loans .........................................................................................56

(f)    Fundamental Changes, Line of Business .........................................................57

(g)    Equipment ......................................................................................................57

(h)    Affiliate Transactions.....................................................................................57

(i)    Settling of Accounts .......................................................................................57

(j)    Compensation; Management Fees ...................................................................57

(k)    Other Agreements ..........................................................................................58

(l)    Billing Services Agreement and Computer Back-Up Agreement .....................58

14.    FINANCIAL COVENANTS.......................................................................................58

(a)    Consolidated Tangible Net Worth ...................................................................58

(b)    Senior Debt Service Coverage ........................................................................58

(c)    Total Debt Service Coverage Ratio .................................................................58

(d)    Leverage.........................................................................................................59

(e)    Capital Expenditure Limitations .....................................................................59

(f)    Operating Lease Obligations...........................................................................59

(g)    Cash Velocity .................................................................................................59

(h)    Minimum Census ............................................................................................59

CHICAGO/#1492002.8

**Table of Contents**

Page

| | | | |
|---|---|---|---|
| 15. | | DEFAULT | 59 |
| | (a) | Payment | 59 |
| | (b) | Breach of This Agreement and the Other Agreements | 59 |
| | (c) | Breaches of Other Obligations | 60 |
| | (d) | Breach of Representations and Warranties | 60 |
| | (e) | Loss of Collateral | 60 |
| | (f) | Levy, Seizure or Attachment | 60 |
| | (g) | Bankruptcy or Similar Proceedings | 60 |
| | (h) | Appointment of Receiver | 60 |
| | (i) | Judgment | 60 |
| | (j) | Death or Dissolution of Obligor | 61 |
| | (k) | Default or Revocation of Guaranty or Collateral Document | 61 |
| | (l) | Criminal Proceedings | 61 |
| | (m) | Change of Control | 61 |
| | (n) | Change of Management | 61 |
| | (o) | Material Adverse Change | 61 |
| | (p) | Government Reimbursement Program Survey Deficiencies | 61 |
| | (q) | Healthcare Authorizations | 62 |
| | (r) | Lockbox Account Instructions | 62 |
| | (s) | Termination of Payor Agreement | 62 |
| | (t) | Failure to Maintain Third-Party Payroll Tax Service Provider | 62 |
| | (u) | Subordinated Debt Documents | 62 |
| | (v) | Failure to Comply with the Terms of the Bankruptcy Order | 62 |
| 16. | | REMEDIES UPON AN EVENT OF DEFAULT | 62 |
| 17. | | CONDITIONS PRECEDENT | 63 |
| | (a) | Conditions Precedent to Initial Loans | 63 |
| | (b) | Conditions Precedent to All Loans | 66 |
| 18. | | AGENTS | 66 |
| | (a) | Appointment of Agents | 66 |
| | (b) | Nature of Duties of Agents | 67 |
| | (c) | Lack of Reliance on Agents | 67 |
| | (d) | Certain Rights of Agents | 68 |

## Table of Contents

Page

| | | | |
|---|---|---|---|
| (e) | Reliance by Agents | 68 |
| (f) | Indemnification of Agents | 68 |
| (g) | Agents in Their Individual Capacity | 68 |
| (h) | Holders of Notes | 69 |
| (i) | Successor Agent | 69 |
| (j) | Collateral Matters | 70 |
| (k) | Actions with Respect to Defaults | 72 |
| (l) | Delivery of Information | 72 |
| (m) | Demand | 72 |
| (n) | Notice of Default | 72 |
| 19. | ASSIGNABILITY | 72 |
| 20. | AMENDMENTS, ETC. | 75 |
| 21. | NONLIABILITY OF AGENTS AND LENDERS | 76 |
| 22. | JOINT AND SEVERAL LIABILITY | 76 |
| 23. | RELEASES; INDEMNITIES | 79 |
| 24. | NOTICE | 80 |
| 25. | APPOINTMENT OF BORROWER REPRESENTATIVE | 80 |
| 26. | CHOICE OF GOVERNING LAW; CONSTRUCTION; FORUM SELECTION | 81 |
| 27. | HEADINGS OF SUBDIVISIONS | 82 |
| 28. | POWER OF ATTORNEY | 82 |
| 29. | CONFIDENTIALITY | 82 |
| 30. | BROKERAGE FEES | 82 |
| 31. | PUBLICITY | 83 |
| 32. | LIMITATION OF ACTIONS | 83 |
| 33. | LIABILITY | 83 |
| 34. | COUNTERPARTS | 83 |
| 35. | ELECTRONIC SUBMISSIONS | 84 |
| 36. | WAIVER OF JURY TRIAL; OTHER WAIVERS | 84 |
| 37. | PATRIOT ACT | 85 |

CHICAGO/#1492002.8

ANNEX I – DEFINED TERMS

EXHIBIT A – BORROWING BASE CERTIFICATE

EXHIBIT B – COMPLIANCE CERTIFICATE

EXHIBIT C – CLOSING DOCUMENT LIST

EXHIBIT D – INFORMATION CERTIFICATE

EXHIBIT E    NOTICE OF BORROWING

EXHIBIT F – ASSIGNMENT AND ACCEPTANCE

EXHIBIT G – JOINDER AGREEMENT

SCHEDULE 1 – PERMITTED LIENS

SCHEDULE 11(b) – BUSINESS AND COLLATERAL LOCATIONS; CERTAIN COLLATERAL

SCHEDULE 11(g) – LITIGATION

SCHEDULE 11(i) – AFFILIATE TRANSACTIONS

SCHEDULE 11(j) – NAMES & TRADE NAMES

SCHEDULE 11(n) – INDEBTEDNESS

SCHEDULE 11(p) – PARENT, SUBSIDIARIES AND AFFILIATES

SCHEDULE 11(q) – DEFAULTS

SCHEDULE 11(t) – ENVIRONMENTAL MATTERS

SCHEDULE 11(x) - HEALTHCARE COMPLIANCE

SCHEDULE 11(y) – HEALTHCARE REGULATORY MATTERS

SCHEDULE 11(z) – LICENSES AND PERMITS

SCHEDULE 11(aa) – HEALTHCARE AUTHORIZATIONS

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (as amended, modified or supplemented from time to time, this "**Agreement**") made this 27th day of October, 2006 by and among BRIDGE OPPORTUNITY FINANCE, LLC, a Delaware limited liability company (in its individual capacity, "**Bridge Opportunity**"), as Term Loan Administrative Agent for itself and all other Term Loan Lenders from time to time a party hereto (in such capacity, "**Term Loan Administrative Agent**"), the Term Loan Lenders, BRIDGE HEALTHCARE FINANCE, LLC, a Delaware limited liability company (in its individual capacity, "**Bridge Healthcare**"), as Revolving Loan Administrative Agent for itself and all other Revolving Lenders from time to time a party hereto (in such capacity, "**Revolving Loan Administrative Agent**," with Term Loan Administrative Agent, sometimes referred to individually as "**Agent**" and collectively as "**Agents**"), the Revolving Lenders, CLC OF BILOXI, LLC, d/b/a BILOXI CLC, a Mississippi limited liability company ("**Biloxi**"), CLC OF BOONEVILLE, LLC, d/b/a LONGWOOD CLC, a Mississippi limited liability company ("**Booneville**"), CLC OF DRESDEN, LLC, d/b/a HILLVIEW CLC, a Tennessee limited liability company ("**Dresden**"), CLC OF DYERSBURG, LLC, d/b/a OAKWOOD CLC, a Tennessee limited liability company ("**Dyersburg**"), CLC OF FULTON, LLC, d/b/a COURTYARDS CLC, a Mississippi limited liability company ("**Fulton**"), CLC OF HUMBOLDT, LLC, d/b/a BAILEY PARK CLC, a Tennessee limited liability company ("**Humboldt**"), CLC OF IUKA, LLC, d/b/a TISHOMINGO CLC, a Mississippi limited liability company ("**Iuka**"), CLC OF JACKSON, LLC, d/b/a PLEASANT HILLS CLC, a Mississippi limited liability company ("**Jackson**"), CLC OF LAKE PROVIDENCE, LLC, d/b/a LAKE PROVIDENCE SUBACUTE REHABILITATION CENTER, a Mississippi limited liability company ("**Lake Providence**"), CLC OF LAUREL, LLC, d/b/a LAURELWOOD CLC, a Mississippi limited liability company ("**Laurel**"), CLC OF LEXINGTON, LLC, d/b/a BRIARWOOD CLC, a Tennessee limited liability company ("**Lexington**"), CLC OF LIBERTY, LLC, a Mississippi limited liability company ("**Liberty**"), CLC OF MANCHESTER, LLC, d/b/a CRESTWOOD CLC, a Tennessee limited liability company ("**Manchester**"), CLC OF MERIDIAN, LLC, d/b/a MERIDIAN CLC, a Mississippi limited liability company ("**Meridian**"), CLC OF OCEAN SPRINGS, LLC, d/b/a SUNPLEX SUBACUTE CENTER, a Mississippi limited liability company ("**Ocean Springs**"), CLC OF PASCAGOULA, LLC, a Mississippi limited liability company ("**Pascagoula**"), CLC OF RIPLEY, LLC, d/b/a LAUDERDALE CLC, a Tennessee limited liability company ("**Ripley**"), CLC OF VAIDEN, LLC, a Mississippi limited liability company ("**Vaiden**"), CLC OF WEST POINT, LLC, d/b/a WEST POINT CLC, a Mississippi limited liability company ("**West Point**"), CLC OF WHITEHAVEN, LLC, d/b/a WHITEHAVEN CLC, a Tennessee limited liability company ("**White Haven**"), and COMMUNITY LIVING CENTERS, LLC, a Mississippi limited liability company ("**CLC**"; the foregoing are hereinafter referred to, collectively, as the "**Borrowers**" and, individually, each as a "**Borrower**"), and the other Credit Parties (as defined below).

## W I T N E S S E T H :

WHEREAS, Borrowers may, from time to time, request Loans from Agents and Lenders, and the parties wish to provide for the terms and conditions upon which such Loans or other financial accommodations, if made by Lenders, shall be made.

CHICAGO/#1492002.8

NOW, THEREFORE, in consideration of any Loan (including any Loan by renewal or extension) hereafter made to Borrowers by Agents and/or Lenders, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Credit Parties, the parties agree as follows:

1.    DEFINITIONS.

(a)    <u>Defined Terms</u>.  For the purposes of this Agreement, capitalized words and phrases shall have the meanings set forth in <u>Annex I</u> attached hereto and made a part hereof.

(b)    <u>Accounting Terms</u>.  Any accounting terms used in this Agreement which are not specifically defined herein shall have the meanings customarily given them in accordance with GAAP.  Calculations and determinations of financial and accounting terms used and not otherwise specifically defined hereunder and the preparation of financial statements to be furnished to Agents and the Lenders pursuant hereto shall be made and prepared, both as to classification of items and as to amount, in accordance with GAAP as used in the preparation of the financial statements of Credit Parties on the date of this Agreement.  If any changes in accounting principles or practices from those used in the preparation of the financial statements are hereafter occasioned by the promulgation of rules, regulations, pronouncements and opinions by or required by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successor thereto or agencies with similar functions), which results in a material change in the method of accounting in the financial statements required to be furnished to Agents and the Lenders hereunder or in the calculation of financial covenants, standards or terms contained in this Agreement, the parties hereto agree to enter into good faith negotiations to amend such provisions so as equitably to reflect such changes to the end that the criteria for evaluating the financial condition and performance of Credit Parties will be the same after such changes as they were before such changes; and, if the parties fail to agree on the amendment of such provisions, Credit Parties will furnish financial statements in accordance with such changes but shall provide calculations for all financial covenants, perform all financial covenants and otherwise observe all financial standards and terms in accordance with applicable accounting principles and practices in effect immediately prior to such changes.

(c)    <u>Terms Defined in UCC</u>.  The terms **"Certificated Security"**, **"Chattel Paper"**, **"Commercial Tort Claim"**, **"Deposit Account"**, **"Document"**, **"Electronic Chattel Paper"**, **"Equipment"**, **"Financial Asset"**, **"Fixture"**, **"General Intangible"**, **"Goods"**, **"Health-Care-Insurance Receivables"**, **"Instrument"**, **"Inventory"**, **"Investment Property"**, **"Letter-of-Credit Right"**, **"Payment Intangible"**, **"Proceeds"**, **"Security"**, **"Securities Account"**, **"Security Entitlement"**, **"Software"**, **"Supporting Obligation"**, **"Tangible Chattel Paper"** and **"Uncertificated Security"** shall have the respective meanings assigned to such terms in the UCC.  All other capitalized words and phrases used herein and not otherwise specifically defined shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined therein.

(d)    <u>Other Definitional Provisions; Construction</u>.  Whenever the context so requires, the neuter gender includes the masculine and feminine, the singular includes the plural, and vice versa.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular

2

provision of this Agreement, and references to Article, Section, Subsection, Annex, Schedule, Exhibit and like references are references to this Agreement unless otherwise specified. The word "including" shall mean "including, without limitation". An Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in accordance with Section 20 hereof. References in this Agreement to any party shall include such party's successors and permitted assigns. References to any "Section" shall be a reference to such Section of this Agreement unless otherwise stated. To the extent any of the provisions of the Other Agreements are inconsistent with the terms of this Agreement, the provisions of this Agreement shall govern. This Agreement and the Other Agreements are the result of negotiations among and have been reviewed by counsel to the Lenders, Credit Parties and any other parties thereto, are product of all parties and, accordingly, they shall not be construed against Agents or Lenders.

(c) References to Agreements, Enactments, Etc. Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of this Agreement or any Other Agreement, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

2. LOANS.

(a) Revolving Loans. Subject to the terms and conditions of this Agreement and the Other Agreements, during the Revolving Loan Term, each Revolving Lender severally and not jointly agrees to make its Pro Rata Share of revolving loans and advances to Borrowers (the "**Revolving Loans**") up to such Revolving Lender's Revolving Loan Commitment so long as after giving effect to such Revolving Loans, the aggregate unpaid principal balance of the Revolving Loans and the Letter of Credit Obligations does not exceed an amount up to the sum of the following sublimits (the "**Revolving Borrowing Base Amount**"):

(i) Up to eighty-five percent (85%) (or, with respect to the Eligible Accounts of Pascagoula, seventy-five percent (75%)), or such lesser percentage as determined by Revolving Loan Administrative Agent in its sole discretion exercised in good faith, of the amount of Borrowers' Eligible Accounts multiplied by the Net Collectible Value Advance Rate; plus

(ii) such reserves against Eligible Accounts as Revolving Loan Administrative Agent elects, in its commercially reasonable (from the perspective of a secured asset-based lender) discretion, determined in good faith, to establish, increase, or decrease from time to time;

provided that, the Revolving Borrowing Base Amount shall in no event exceed Seven Million Dollars ($7,000,000) (the "**Maximum Revolving Loan Limit**").

3

The aggregate unpaid principal balance of the Revolving Loans shall not at any time exceed the lesser of the (x) Revolving Borrowing Base Amount minus the Letter of Credit Obligations and (y) the Maximum Revolving Loan Limit minus the Letter of Credit Obligations. If at any time the amount of outstanding Revolving Loans exceeds either the Revolving Borrowing Base Amount or the Maximum Revolving Loan Limit, in each case minus the Letter of Credit Obligations, or any portion of the Revolving Loans exceeds any applicable sublimit within the Revolving Borrowing Base Amount, Borrowers shall immediately, and without the necessity of demand by Revolving Loan Administrative Agent, pay to Revolving Loan Administrative Agent such amount as may be necessary to eliminate such excess and Revolving Loan Administrative Agent shall apply such payment in accordance with Section 5.

Subject to the terms and conditions of this Agreement, Revolving Loans shall be made against the Revolving Borrowing Base Amount. The Revolving Borrowing Base Amount shall be determined by Revolving Loan Administrative Agent (including the eligibility of Accounts) based on the most recent Borrowing Base Certificate delivered to Revolving Loan Administrative Agent in accordance with this Agreement and such other information as may be available to Revolving Loan Administrative Agent. Without limiting any other rights and remedies of Revolving Loan Administrative Agent and the Revolving Lenders hereunder or under the other Loan Documents, the Revolving Loans shall be subject to Revolving Loan Administrative Agent's continuing right to withhold from the Revolving Borrowing Base Amount reserves, and to increase and decrease such reserves from time to time, if and to the extent that in Revolving Loan Administrative Agent's commercially reasonable (from the perspective of a secured asset-based lender) discretion, determined in good faith, such reserves are necessary, including to protect the interest of Agents and the Lenders in the Collateral or to protect Agents and the Lenders against possible non-payment of Accounts for any reason by Account Debtors or possible diminution of the value of any Collateral or possible non-payment of any of the Obligations or for any taxes or customs duties or in respect of any state of facts which may constitute an Event of Default. Revolving Loan Administrative Agent may, at its option, implement reserves by designating as ineligible a sufficient amount of Accounts which would otherwise be Eligible Accounts, so as to reduce the Revolving Borrowing Base Amount by the amount of the intended reserves. Revolving Loan Administrative Agent may, in its commercially reasonable (from the perspective of a secured asset-based lender) discretion, determined in good faith, further adjust the Revolving Borrowing Base Amount based upon Borrowers' actual recent collection history and any pending or probable, but not yet applied, non-cash credits against Accounts as determined by Revolving Loan Administrative Agent in its commercially reasonable (from the perspective of a secured asset-based lender) discretion, determined in good faith, in connection with the calculation of the Net Collectible Value Advance Rate or otherwise from time to time as warranted by Revolving Loan Administrative Agent's underwriting practices and procedures and using its commercially reasonable (from the perspective of a secured asset-based lender) discretion, determined in good faith.

Neither any Agent nor any Lender shall be responsible for any failure by any other Revolving Lender to perform its obligations to make Revolving Loans hereunder, and the failure of any Revolving Lender to make its Pro Rata Share of any Revolving Loan hereunder shall not relieve any other Revolving Lender of its obligation, if any, to make its Pro Rata Share of any Revolving Loans hereunder.

4

If Borrower Representative makes a request for a Revolving Loan as provided herein, Revolving Loan Administrative Agent, at its option and in its sole discretion, shall do either of the following:

           (i)     advance the amount of the proposed Revolving Loan to such Borrower Representative disproportionately (a **"Disproportionate Advance"**) out of Revolving Loan Administrative Agent's own funds on behalf of Revolving Lenders, which advance shall be on the same day as Borrower Representative's request therefor if Borrower Representative notifies Revolving Loan Administrative Agent of such request by 1:00 P.M. (Chicago time) on such day, and request settlement in accordance with Section 5 such that upon such settlement each Revolving Lender's share of the outstanding Revolving Loans (including, without limitation, the amount of any Disproportionate Advance) equals its Pro Rata Share; or

           (ii)    Notify each Revolving Lender by telecopy, electronic mail or other similar form of teletransmission of the proposed advance on the same day Revolving Loan Administrative Agent is notified or deemed notified by Borrower Representative of Borrower Representative's request for an advance pursuant to this Section 2(a). Each Revolving Lender shall remit, to the demand deposit account designated by Borrower Representative at or prior to 3:00 P.M., Chicago time, on the date of notification, if such notification is made before 11:30 A.M., Chicago time, or 11:00 A.M., Chicago time, on the Business Day immediately succeeding the date of such notification, if such notification is made after 11:30 A.M., Chicago time, immediately available funds in an amount equal to such Revolving Lender's Pro Rata Share of such proposed advance.

If and to the extent that a Revolving Lender does not settle with Revolving Loan Administrative Agent, as required under this Agreement (a **"Defaulting Lender"**), Borrowers and Defaulting Lender severally agree to repay to Revolving Loan Administrative Agent, forthwith on demand, such amount required to be paid by such Defaulting Lender to Revolving Loan Administrative Agent, together with interest thereon, for each day from the date such amount is made available to Borrowers until the date such amount is repaid to Revolving Loan Administrative Agent (x) in the case of a Defaulting Lender at the rate published by the Federal Reserve Bank of New York on the next succeeding Business Day as the "Federal Funds Rate," or if no such rate is published for any Business Day, at the average rate quoted for such day for such transactions from three (3) federal funds brokers of recognized standing selected by Revolving Loan Administrative Agent, and (y) in the case of Borrowers, at the interest rate applicable at such time for such Revolving Loans; provided, that Borrowers' obligation to repay such advance to Revolving Loan Administrative Agent shall not relieve such Defaulting Lender of its liability to Revolving Loan Administrative Agent for failure to settle as provided in this Agreement or relieve Defaulting Lender of its obligations to Borrowers under this Agreement.

Each Borrower hereby authorizes Revolving Loan Administrative Agent, in its sole discretion, to charge any accounts of any Borrower or advance Revolving Loans to make any payments of principal, interest, fees, costs or expenses required to be made under this Agreement or the Other Agreements.

A request for a Revolving Loan shall be made or shall be deemed to be made, each in the following manner: Borrower Representative may give Revolving Loan Administrative Agent same-day notice, no later than 10:00 A.M. Chicago time on such day, of its request for a Revolving Loan by submitting a Notice of Borrowing, in which notice Borrower Representative shall specify the amount of the proposed borrowing and the proposed borrowing date; provided, however, that no such request may be made at a time when there exists a Default or an Event of Default. In the event that any Borrower maintains a controlled disbursement account with a financial institution designated by Revolving Loan Administrative Agent, each check presented for payment against such controlled disbursement account and any other charge or request for payment against such controlled disbursement account shall constitute a request for a Revolving Loan. Borrower Representative's Notice of Borrowing shall be accompanied with a certificate, on a form designated by Revolving Loan Administrative Agent and in substance satisfactory to Revolving Loan Administrative Agent, certifying the Revolving Borrowing Base Amount and providing such backup information as Revolving Loan Administrative Agent shall deem necessary. Revolving Loan Administrative Agent may from time to time change the form of such Borrowing Base Certificate and/or Notice of Borrowing and shall at all times have the right to request a separate Borrowing Base Certificate from each Borrower. As an accommodation to Borrowers, Revolving Loan Administrative Agent may permit electronic transmittal of instructions, authorizations, agreements or reports to Revolving Loan Administrative Agent by Borrowers. Unless Borrower Representative specifically directs Revolving Loan Administrative Agent in writing not to accept or act upon telephonic or electronic communications from Borrowers, Revolving Loan Administrative Agent shall have no liability to any Credit Party for any loss or damage suffered by any Credit Party as a result of Revolving Loan Administrative Agent's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically or electronically and purporting to have been sent to Revolving Loan Administrative Agent by any Borrower, and Revolving Loan Administrative Agent shall have no duty to verify the origin of any such communication or the authority of the Person sending it.

Each Borrower hereby irrevocably authorizes Revolving Loan Administrative Agent to disburse the proceeds of each Revolving Loan requested by Borrower Representative, or deemed to be requested by Borrower Representative, as follows: the proceeds of each Revolving Loan requested under this Section 2(a) shall be disbursed by Revolving Loan Administrative Agent in lawful money of the United States of America in immediately available funds, in the case of the initial borrowing, in accordance with the terms of the written disbursement letter from Borrower, and in the case of each subsequent borrowing, by wire transfer or Automated Clearing House (ACH) transfer to such bank account as may be agreed upon by Borrower Representative and Revolving Loan Administrative Agent from time to time, or elsewhere if pursuant to a written direction from Borrower Representative.

(b)    Term Loan A. Subject to the terms and conditions of this Agreement and the Other Agreements, on the date that the conditions to the initial Loans are satisfied, each Term Loan A Lender severally agrees to make a term loan to Borrowers in an amount equal to its Pro Rata Share of Four Million and No/100 Dollars ($4,000,000) ("**Term Loan A**"). Amounts repaid with respect to Term Loan A may not be reborrowed. Neither any Agent nor any Lender shall be responsible for any failure by any other Term Loan A Lender to perform its obligations to make its Pro Rata Share of Term A Loan hereunder, and the failure of any Term Loan A

6

Lender to make its Pro Rata Share of Term Loan A hereunder shall not relieve any other Term Loan A Lender of its obligation, if any, to make its Pro Rata Share of Term Loan A hereunder.

(c)    Term Loan B. Subject to the terms and conditions of this Agreement and the Other Agreements, on the date that the conditions of Term Loan B are satisfied, each Term Loan B Lender severally, and not jointly, agrees to make such Term Loan B Lender's Pro Rata Share of a term loan ("**Term Loan B**") available to Borrowers in an amount equal to the lesser of (x) the sum of (i) the Pascagoula Purchase Price, plus (ii) the Pascagoula Settlement, plus (iii) reasonable transaction expenses incurred in connection with the Pascagoula Acquisition, and (y) Eight Million Seven Hundred Thousand and No/100 Dollars ($8,700,000). The conditions to Term Loan B shall include:

(i)    Borrower Representative shall have provided evidence to Agents, in form and substance satisfactory to Agents, that (A) Borrowers will use all of the proceeds of Term Loan B to finance the Pascagoula Acquisition and the payment of the Pascagoula Settlement and reasonable transaction expenses incurred in connection with the Pascagoula Acquisition and (B) the purchase price for the Pascagoula Acquisition does not exceed Eight Million and No/100 Dollars ($8,000,000) and the settlement of the claims of the Pascagoula Seller does not exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000), in each case, exclusive of transaction expenses pertaining thereto;

(ii)    the Pascagoula Acquisition is not a hostile or contested acquisition, and no Credit Party shall, as a result of or in connection with the Pascagoula Acquisition, assume or incur any direct or contingent liabilities (whether relating to environmental, tax, litigation, or other matters) that could reasonably be expected to have a Material Adverse Effect on any Credit Party;

(iii)    no Material Adverse Effect with respect to any Credit Party shall have occurred;

(iv)    the Pascagoula Acquisition shall be structured as an asset acquisition by Pascagoula Inc., Agents shall have been granted a first priority perfected Lien on all assets acquired pursuant thereto, and, without limiting the generality of the foregoing, Credit Parties shall have complied with Section 6(k) with respect to all Real Property acquired in connection therewith;

(v)    evidence satisfactory to Agents that all licenses and permits necessary to operate the Pascagoula Healthcare Facility have been obtained and are in full force and effect;

(vi)    both before and immediately after giving effect to the Pascagoula Acquisition, (A) each of the representations and warranties in the Loan Documents is true and correct (except (1) any such representation or warranty which relates to a specified prior date and (2) to the extent the Agents and the Lenders have been notified in writing by Borrower Representative that any representation or warranty is not correct and the Required Lenders have explicitly waived in writing compliance with such representation

7

or warranty) and (B) no Default or Event of Default exists, will exist, or would result therefrom;

(vii)   Borrower Representative shall certify (and provide Agents with a calculation in form and substance reasonably satisfactory to Agents), to Agents and the Lenders that, (x) Credit Parties have Consolidated EBITDA (determined for the prior twelve month period) of at least $5,500,000 and (y) Pascagoula, individually, has Consolidated EBITDA (determined solely for Pascagoula for the prior twelve month period) of at least $1,300,000;

(viii)   Borrower Representative shall certify (and provide Agents with a pro forma calculation in form and substance reasonably satisfactory to Agents), to Agents and the Lenders that, after giving effect to the completion of the Pascagoula Acquisition, on a pro forma basis (x) Excess Availability will not be less than $500,000 and (y) Credit Parties shall be in compliance with Section 14;

(ix)   at least ten (10) Business Days' (or such lesser period as Agents shall require) prior to the date of the Pascagoula Acquisition, Agents shall have received, in form and substance reasonably satisfactory to Agents, (a) copies of the Pascagoula Acquisition Diligence Deliveries, including, without limitation, all opinions, certificates, lien search results and other documents requested by Agents, and (b) any additional Loan Documents (including, without limitation, promissory notes evidencing Term Loan B, a collateral assignment of rights under the Pascagoula Acquisition Documents and a joinder by Pascagoula Inc. as a Borrower hereunder and under the other Loan Documents) and any amendments to the Loan Documents, in each case, as Agents may deem necessary in their sole discretion;

(x)   a certificate, in form, scope and substance acceptable to Agents of an Authorized Accounting Officer of Borrower Representative, confirming satisfaction of each of the foregoing conditions precedent shall have been delivered to Agents prior to the Pascagoula Acquisition;

(xi)   the Pascagoula Acquisition shall have been closed no later than November 1, 2006, at which time, if not earlier terminated, the Term Loan B Commitment shall terminate; and

(xii)   Borrowers shall have delivered or caused to be delivered to Agents and each Lender any and all other documents, agreements and instruments reasonably deemed necessary by Agents or any Term Loan B Lender in connection with the making of Term Loan B.

Subject to fulfillment by Borrowers of the conditions herein for Term Loan B, Borrower Representative may give Term Loan Administrative Agent notice no later than 10:00 A.M., Chicago time, on the date two (2) Business Days prior to such proposed borrowing date of its request for the advance of Term Loan B in which Borrower Representative shall specify the amount of the proposed borrowing (consistent with this Section 2(c)) and the proposed borrowing date, which shall be a Business Day; provided, however, that no such request may be

made at a time when there exists a Default or an Event of Default. Amounts repaid with respect to Term Loan B may not be reborrowed. Neither any Agent nor any Lender shall be responsible for any failure by any other Term Loan B Lender to perform its obligations to make its Pro Rata Share of Term Loan B hereunder, and the failure of any Term Loan B Lender to make its Pro Rata Share of Term Loan B hereunder shall not relieve any other Term Loan B Lender of its obligation, if any, to make its Pro Rata Share of Term Loan B hereunder.

If Borrower Representative makes a request for the advance of Term Loan B as provided herein, Term Loan Administrative Agent shall notify each Term Loan B Lender by telecopy, electronic mail or other similar form of teletransmission of the proposed advance on the same day Term Loan Administrative Agent is notified of the request for an advance pursuant to this Section 2(c). Each Term Loan B Lender shall remit, to the demand deposit account designated by Borrower Representative, no later than 10:30 A.M., Chicago time, on the date Term Loan B is to be advanced, immediately available funds in an amount equal to such Term Loan B Lender's Pro Rata Share of Term Loan B. Borrowers hereby irrevocably authorize Term Loan Administrative Agent to disburse the proceeds of each advance under Term Loan B as requested by Borrower Representative.

(d)    Repayments.  Unless sooner required to be repaid pursuant to the terms of this Agreement, the Obligations shall be repaid as follows:

(i)    Repayment of Revolving Loans.  The Revolving Loans and all other Obligations (other than the Term Loans) shall be repaid on the last day of the Revolving Loan Term.

(ii)    Repayment of Term Loan A.  Term Loan A shall be repaid, based upon a sixty (60) month amortization schedule, in equal monthly installments of Sixty-Six Thousand Six Hundred Sixty-Six and 67/100 Dollars ($66,666.67) payable on the first day of each month commencing December 1, 2006; provided, that any remaining outstanding principal balance of Term Loan A shall be repaid at the end of the Term Loan A Term.  If any such payment due date is not a Business Day, then such payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest and fees due hereunder.

(iii)    Repayment of Term Loan B.  Term Loan B shall be repaid in equal monthly installments, based upon a 240-month amortization schedule, with such payments commencing on the first day of the first month after the first anniversary of the advance of Term Loan B; provided that any remaining outstanding principal balance of Term Loan B shall be repaid at the end of the Term Loan B Term.  If any such payment due date is not a Business Day, then such payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest and fees due hereunder.

(iv)    Mandatory Prepayments of Loans.

(1)    Proceeds of Sale, Loss, Destruction or Condemnation of Collateral.

9