**08 C 730**

**JUDGE KENNELLY**
**MAGISTRATE JUDGE ASHMAN**

# Exhibit B

## Part 3

this Agreement, arising from or related to an Event of Default, which is disallowed as a claim in any Insolvency or Liquidation Proceeding, before any distribution is made in respect of the claims held by the Revolving Lenders and Term Loan A Lenders, with the Revolving Loan Administrative Agent and Revolving Lenders and Term Loan Administrative Agent (in its capacity as administrative agent for the Term Loan A Lenders) and Term Loan A Lenders hereby acknowledging and agreeing to turn over to the Term Loan Administrative Agent, for itself (in its capacity as administrative agent for the Term Loan B Lenders) and on behalf of the Term Loan B Lenders, amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Revolving Lenders and Term Loan A Lenders).

(d)     Other Security.  Either Agent, in its sole discretion, without waiving or releasing any obligation, liability or duty of any Credit Party under this Agreement or the Other Agreements or any Event of Default, may at any time or times hereafter, but shall not be obligated to, pay, acquire or accept an assignment of any Lien asserted by any Person in, upon or against the Collateral, provided, that Agents may take such actions with respect to Permitted Liens only after the occurrence and during the continuance of an Event of Default.  All sums paid by Agents in respect thereof and all costs, fees and expenses, including, without limitation, reasonable attorneys' fees, all court costs and all other charges relating thereto incurred by either Agent shall constitute Obligations payable by Borrowers to such Agent on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(e)     Possessory Collateral.  Immediately upon any Credit Party's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Tangible Chattel Paper and any Investment Property consisting of Certificated Securities, such Credit Party shall deliver the original thereof to Revolving Loan Administrative Agent (or, if such Collateral constitutes Term Loan Priority Collateral, to Term Loan Administrative Agent) together with an appropriate endorsement or other specific evidence of assignment thereof to Revolving Loan Administrative Agent (or, if such Collateral constitutes Term Loan Priority Collateral, to Term Loan Administrative Agent) (in form and substance acceptable to the applicable Agent).  If an endorsement or assignment of any such items shall not be made for any reason, each Agent is hereby irrevocably authorized, as such Credit Party's attorney and agent-in-fact, to endorse or assign the same on such Credit Party's behalf.

(f)     Electronic Chattel Paper.  To the extent that any Credit Party obtains or maintains any Electronic Chattel Paper, such Credit Party shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (i) a single authoritative copy of the record or records exists which is unique, identifiable and, except as otherwise provided in clauses (iv), (v) and (vi) below, unalterable, (ii) the authoritative copy identifies Agents as the assignees of the record or records, (iii) the authoritative copy is communicated to and maintained by Agents or their designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Agents, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

CHICAGO/#1492002.8

(g)    Letter-of-Credit Rights.  If any Credit Party at any time is a beneficiary under a letter of credit now or hereafter issued in favor of such Credit Party, at the request and option of either Agent, Credit Parties shall, pursuant to an agreement in form and substance satisfactory to such Agent, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to such Agent of the proceeds of any drawing under the letter of credit, or (ii) arrange for such Agent to become the transferee beneficiary of the letter of credit, with such Agent agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied as provided in this Agreement.

(h)    Third-Party Collateral.  If any Credit Party shall at any time hold or acquire an interest in Collateral in the possession of a third party (other than Certificated Securities and Goods covered by a Document), such Credit Party shall immediately obtain an acknowledgment from the third party that it is holding such Collateral for the benefit of the Agents and the Lenders.

(i)    Deposit Account.  Each Credit Party shall deliver to Agents, with respect to each Deposit Account maintained by such Credit Party now or hereafter (other than with Agents) and that is permitted hereby, upon obtaining an interest in such Deposit Account, a deposit account control agreement or blocked account agreement, as required by Agents, in form and substance satisfactory to Agents, executed by the financial institution at which such account is maintained, and shall take such other actions as Agents may request to ensure that Agents' security interest in such account is perfected by control as such term is used in UCC §9-104.

(j)    Insurance Proceeds.  Subject to Section 2(d)(iv), the net proceeds of any casualty insurance insuring the Collateral, after deducting all costs and expenses (including attorneys' fees) of collection, shall be applied, at Agents' option, either toward replacing or restoring the Collateral, in a manner and on terms satisfactory to Agents, or toward payment of the Obligations.  Any proceeds applied to the payment of Obligations shall be applied in accordance with Section 5.  In no event shall such application relieve any Borrower or other Credit Party from payment in full of all installments of principal and interest which thereafter become due in the order of maturity thereof.

(k)    Mortgages.  The due and punctual payment and performance of the Obligations shall also be secured by the Lien created by the Mortgages upon all Real Property of Credit Parties described therein.  If any Credit Party shall acquire at any time or times hereafter any Real Property, such Credit Party agrees promptly to execute and deliver to Agents, for their benefit and the benefit of the Lenders, as additional security and Collateral for the Obligations, a Mortgage satisfactory in form and substance to Agents covering such Real Property.  The Mortgages shall be duly recorded (at Borrowers' expense) in each office where such recording is required to constitute a valid Lien on the Real Property interest covered thereby.  In respect to any Mortgage, Credit Parties shall deliver to Agents, at Borrowers' expense, mortgagee title insurance policies issued by a title insurance company reasonably satisfactory to Agents, which policies shall be in form and substance reasonably satisfactory to Agents and shall insure a valid Lien in favor of Agents, for their benefit and the benefit of the Lenders, on the property covered thereby, subject only to Permitted Liens and those other exceptions reasonably acceptable to Agents.  Credit Parties shall also deliver to Agents such other usual and customary documents,

26

including, without limitation, ALTA Surveys of the Real Property described in the Mortgages, as Agents may reasonably request relating to the Real Property subject to the Mortgages.

7.    PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY INTERESTS THEREIN; POSSESSION OF COLLATERAL.

(a)    Subject to applicable law, each Credit Party shall, unless the Required Lenders otherwise consent, (i) cause each of its Subsidiaries to become or remain a Credit Party and a Guarantor and (ii) cause each of its Subsidiaries formed or acquired after the Closing Date in accordance with the terms of this Agreement to (1) become a party to this Agreement by executing the Joinder Agreement set forth as Exhibit G hereto (the "**Joinder Agreement**"), and (2) guarantee payment and performance of the Obligations pursuant to a Guaranty Agreement and, if required by the Agents, become a Borrower under this Agreement.

(b)    Each Credit Party shall, at either Agent's request, at any time and from time to time, authenticate, execute and deliver to such Agent such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by either Agent) and do such other acts and things or cause third parties to do such other acts and things as such Agent may deem necessary or desirable in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of such Agent (free and clear of all other Liens, except Permitted Liens) to secure payment of the Obligations, and in order to facilitate the collection of the Collateral.  Each Credit Party irrevocably hereby makes, constitutes and appoints each Agent (and all Persons designated by such Agent for that purpose) as such Credit Party's true and lawful attorney and agent-in-fact to execute and file such financing statements, documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect such Agent's security interest in the Collateral.  Each Credit Party further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement.  Each Credit Party further ratifies and confirms the prior filing by either Agent of any and all financing statements which identify such Credit Party as debtor, such Agent as secured party and any or all Collateral as collateral.

(c)    Each Credit Party will cause 100% (or such lesser amount owned by such Credit Party) of the issued and outstanding Equity Interests of each of its Subsidiaries to be subject at all times to a first priority, perfected Lien in favor of the Agents pursuant to the terms and conditions of the Loan Documents or other security documents as the Agents shall reasonably request.

(d)    Until otherwise notified by Agents following the occurrence of and during the continuance of an Event of Default, each Credit Party shall have the right, except as otherwise provided in this Agreement, in the ordinary course of such Credit Party's business, to (a) sell, lease or furnish under contracts of service any of such Credit Party's Inventory normally held by such Credit Party for any such purpose; (b) use and consume any raw materials, work in process or other materials normally held by such Credit Party for such purpose; and (c) dispose of obsolete or unuseful Equipment so long as all of the proceeds thereof are used to acquire replacement Equipment of equal or higher value and if not shall be paid to Agents for application

27

to the Obligations (except for such proceeds which are required to be delivered to the holder of a Permitted Lien which is prior in right of payment); provided, however, that a sale in the ordinary course of business shall not include any transfer or sale in satisfaction, partial or complete, of a debt owed by such Credit Party.

8.    COLLECTIONS.

(a)    Each Borrower shall establish and maintain a lockbox (the "**Lockbox**") with a United States depository institution designated from time to time by Agents (the "**Lockbox Bank**"), subject to the provisions of this Agreement for receivables from Governmental Account Debtors. Each Borrower shall execute with the Lockbox Bank a lockbox agreement for the Governmental Account Debtor Collection Lockbox Account in form and substance acceptable to Agents, and such other agreements related to such lockbox agreement as Agents may require. Each Borrower shall ensure that all collections of Accounts on which Governmental Account Debtors are obligated are paid directly into the Lockbox for deposit into the Governmental Account Debtor Collection Lockbox Account, and that all funds deposited into the Governmental Account Debtor Collection Lockbox Account are immediately transferred into a depository account owned by Agents (the "**Concentration Account**").

(b)    Each Borrower shall establish and maintain a second lockbox (also referred to herein as the "Lockbox") with the Lockbox Bank, subject to the provisions of this Agreement for receivables from Account Debtors other than Governmental Account Debtors. Each Borrower shall execute with the Lockbox Bank a separate lockbox agreement for the Account Debtor Collection Lockbox Account in form and substance acceptable to Agents, and such other agreements related to such lockbox agreement as Agents may require. Each Borrower shall ensure that all collections of Accounts on which Account Debtors (other than Governmental Account Debtors) are obligated are paid directly into the Lockbox for deposit into the Account Debtor Collection Lockbox Account, and that all funds deposited into the Account Debtor Collection Lockbox Account are immediately transferred into the Concentration Account.

(c)    Notwithstanding anything in any lockbox agreement to the contrary, each Borrower agrees that it shall be liable for any fees and charges in effect from time to time and charged by the Lockbox Bank in connection with the Lockboxes and Lockbox Accounts, and that neither Agents nor any Lender shall have any liability therefor. Each Borrower further acknowledges and agrees that, to the extent such fees and charges are not paid by such Borrower directly but are satisfied using collections in the Lockbox Accounts, such fees and charges shall be deemed to be Revolving Loans made by Revolving Lenders hereunder and, to the extent that the payment of such fees or charges by such Borrower as provided herein results in any overadvance under this Agreement, such Borrower agrees to immediately (upon notice) repay to Agents the amount of such overadvance and Agents shall apply such repayment in accordance with Section 5. Each Borrower agrees to indemnify and hold Agents and the Lenders harmless from any and all liabilities, claims, losses and demands whatsoever, including reasonable attorneys' fees and expenses, arising from or relating to actions of Agents, any Lender or the Lockbox Bank pursuant to this Section 8 or any lockbox agreement.

CHICAGO/#1492002.8

(d)     Each Borrower agrees that all payments made to the Concentration Account or otherwise received by Agents or any Lender, whether in respect of the Accounts or as Proceeds of other Collateral or otherwise (except for proceeds of Collateral which are required to be delivered to the holder of a Permitted Lien which is prior in right of payment), will be applied on account of the Obligations in accordance with the terms of this Agreement.

(e)     Subject to applicable law regarding Governmental Account Debtors, Agents may, at any time and from time to time after the occurrence and during the continuance of an Event of Default, whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Obligations, (i) enforce collection of any Accounts of any Credit Party or other amounts owed to any Credit Party by suit or otherwise; (ii) exercise all of any Credit Party's rights and remedies with respect to proceedings brought to collect any Accounts or other amounts owed to such Credit Party; (iii) surrender, release or exchange all or any part of any Accounts or other amounts owed to any Credit Party, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (iv) sell or assign any Account of any Credit Party or other amount owed to any Credit Party upon such terms, for such amount and at such time or times as Agents deem advisable; (v) prepare, file and sign any Credit Party's name on any proof of claim in bankruptcy or other similar document against any Account Debtor or other Person obligated to any Credit Party; and (vi) do all other acts and things which are necessary, in Agents' sole discretion, to fulfill any Credit Party's obligations under this Agreement and the Other Agreements and to allow Agents to collect the Accounts or other amounts owed to any Credit Party.  In addition to any other provision hereof, Agents may at any time, after the occurrence and during the continuance of an Event of Default, at Borrowers' expense, notify Account Debtors (subject to applicable law regarding Governmental Account Debtors) to make payment directly to Agents of any amounts due or to become due thereunder (and once such notice has been given to an Account Debtor, no Credit Party shall give any contrary instructions to such Account Debtor during the continuance of an Event of Default without Agents' prior written consent).

(f)     For purposes of calculating interest and fees, Agents shall, within five (5) Business Days after receipt by Agents at their office in Chicago, Illinois of cash or other immediately available funds from collections of items of payment and Proceeds of any Collateral, apply the whole or any part of such collections or Proceeds against the Obligations in the order described in Section 5.  For purposes of determining the amount of Loans available for borrowing purposes, checks and cash or other immediately available funds from collections of items of payment and Proceeds of any Collateral shall be applied in whole or in part against the Obligations, in the order described in Section 5 on the day of receipt, subject to actual collection.

(g)     On a monthly basis, Agents shall deliver to Borrowers an account statement showing all Loans, charges and payments which shall be deemed final, binding and conclusive upon Borrowers unless Borrowers notify Agents in writing, specifying any error therein, within thirty (30) days of the date such account statement is sent to Borrowers, and any such notice shall only constitute an objection to the items specifically identified.

29

9.    COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND SCHEDULES.

(a)    Borrowing Base Reports. Borrowers shall deliver to Revolving Loan Administrative Agent at least once each week, and otherwise, from time to time, to the extent requested by Revolving Loan Administrative Agent, and, in any event, in connection with any Revolving Loan request of any Borrower, an executed Borrowing Base Certificate in the form of Exhibit A, which Borrowing Base Certificate further shall be accompanied by copies of Borrowers' sales journal, cash receipts journal and credit memo journal, which journal shall report contractual allowances made by Borrowers, for the relevant period. Such Borrowing Base Certificate shall reflect the activity of Borrowers with respect to Accounts for the immediately preceding week, shall be in a form and with such specificity as is satisfactory to Revolving Loan Administrative Agent and shall contain such additional information concerning Accounts and other Collateral as may be requested by Revolving Loan Administrative Agent, including, without limitation, but only if specifically requested by Revolving Loan Administrative Agent, copies of all invoices prepared in connection with such Accounts.

(b)    Reserved.

(c)    Monthly Reports.    Borrowers shall deliver to Revolving Loan Administrative Agent, in addition to any other reports, as soon as practicable and in any event: (i) within ten (10) days after the end of each month, (A) a detailed trial balance of Borrowers' Accounts aged by Payor per date of service, in form and substance reasonably satisfactory to, including, without limitation, the names and addresses of all Account Debtors of Borrowers and the patients to whom such Account Debtors relate, and (B) a summary and detail of accounts payable (such Accounts and accounts payable divided into such time intervals as Revolving Loan Administrative Agent may require in its sole discretion), including a listing of any held checks; and (ii) within ten (10) days after the end of each month, (x) completed Account Debtor reconciliation form, in a format provided by Revolving Loan Administrative Agent, and (y) a text file containing a list of Borrowers' Accounts aged by Payor per date of service, including, without limitation, the names and addresses of all Account Debtors of Borrowers and the patients to whom such Account Debtors relate.

(d)    Cost Reports.    Within five (5) days after the date due (or earlier, if available), Borrowers shall deliver to Revolving Loan Administrative Agent all cost reports (interim and annual) filed with all Governmental Authorities or other Persons, as applicable.

(e)    Financial Statements. Credit Parties shall deliver to Agents and each Lender the following financial information, all of which shall be prepared by Credit Parties and their Subsidiaries, on a consolidated and consolidating basis in accordance with GAAP consistently applied, and shall be accompanied by a certificate in the form of Exhibit B hereto (a "**Compliance Certificate**"), which Compliance Certificate shall include a calculation of all financial covenants contained in this Agreement:  (i) no later than thirty (30) days after each calendar month, copies of internally prepared financial statements, including, without limitation, balance sheets and statements of income, retained earnings and cash flow, certified by the Authorized Accounting Officer of Credit Parties; (ii) no later than thirty (30) days after the end of each of the first three quarters of each Fiscal Year, copies of internally prepared financial

30

statements, including, without limitation, balance sheets, statements of income, retained earnings, cash flows and reconciliation of surplus, certified by the Authorized Accounting Officer of Borrower Representative; and (iii) no later than ninety (90) days after the end of each Fiscal Year, audited annual financial statements with an unqualified opinion (with respect to the consolidated financial statements only) by independent certified public accountants selected by Credit Parties and reasonably satisfactory to Agents. The report of such accountants shall be accompanied by (A) a statement certifying that in making the examination upon which such report was based either no information came to their attention which to their knowledge constituted an Event of Default under this Agreement or any related agreement or, if such information came to their attention, specifying any such Event of Default, its nature, when it occurred and whether it is continuing, and such report shall contain or have appended thereto calculations which set forth compliance with the requirements or restrictions imposed by Section 14; and (B) copies of any management letters sent to any Credit Party by such accountants.

(f)    Annual Projections. As soon as practicable and in any event not less than sixty (60) days prior to the beginning of each Fiscal Year, Credit Parties shall deliver to Agents and each Lender projected balance sheets, statements of income and cash flow, for each of the twelve (12) months during such Fiscal Year, which shall be prepared for Credit Parties and their Subsidiaries, on a consolidated and consolidating basis, in accordance with GAAP, and which shall include the assumptions used therein, together with appropriate supporting details as reasonably requested by Agents.

(g)    Explanation of Projections. In conjunction with the delivery of the annual presentation of projections referred to in Section 9(f) above, Credit Parties shall deliver a letter signed by an Authorized Accounting Officer of Credit Parties, describing, comparing and analyzing, in detail, all changes and developments between the anticipated financial results included in such projections and the historical financial statements of Credit Parties.

(h)    Invoices and Billing Statements. Promptly following request therefor by either Agent, Credit Parties shall provide copies of sales journals, cash receipt journals and deposit slips, copies of service invoices, customer statements and credit memoranda issued, remittance advices and reports, evidence of billing and copies of shipping and delivery documents.

(i)    Obligor Financial Statements and Tax Returns. Credit Parties shall cause each Obligor (other than a Credit Party) to deliver to Agents and each Lender such Obligor's annual financial statement (in form acceptable to Agents) and a copy of such Obligor's federal income tax return with respect to the corresponding year, in each case on the date when such tax return is due or, if earlier, on the date when available. Credit Parties shall deliver to Agents and each Lender a copy of Credit Parties' federal income tax return on the date when such tax return is due or, if earlier, on the date when available.

(j)    Bankruptcy Payments. Within five (5) days following the end of each month, Credit Parties shall deliver to Revolving Loan Administrative Agent documentation that each of the scheduled payments required to be made pursuant to the Bankruptcy Confirmation Order or the Bankruptcy Plan of Reorganization described therein have been made, including

31

evidence of payment from Credit Parties' financial institution, which documentation shall be certified as true and accurate by an Authorized Officer of Credit Parties.

(k)     Audited Balance Sheet.  Within sixty (60) days of the date hereof, an audited balance sheet of Credit Parties as of the date hereof by independent certified public accountants selected by Credit Parties and reasonably satisfactory to Agents.

(l)     Other Information.  Promptly following request therefor by either Agent, Credit Parties shall provide such other business or financial data, reports, appraisals and projections as such Agent may reasonably request.  This may include, without limitation, a monthly certificate from an Authorized Accounting Officer of Credit Parties showing compliance with each of the financial covenants set forth in Section 14 of this Agreement, and stating whether any Event of Default or Default has occurred, and if so, the steps being taken to prevent or cure such Event of Default or Default.

10.     TERMINATION; AUTOMATIC RENEWAL; EARLY TERMINATION.

(a)     If not earlier terminated pursuant to this Agreement the Commitments shall be terminate, and unless sooner required to be repaid pursuant to this Agreement the Loans shall mature and be payable in full, on the following dates: (i) with respect to the Revolving Loan Commitment and Revolving Loans, October 27, 2010 (the "**Revolving Loan Term**"), (ii) with respect to Term Loan A Commitment and Term Loan A, October 27, 2009 (the "**Term Loan A Term**"), and (iii) with respect to Term Loan B Commitment and Term Loan B, October 27, 2010 (the "**Term Loan B Term**"; the Revolving Loan Term, Term Loan A Term and Term Loan B Term are each referred to herein, individually, as the "**Term**").  In the event a Commitment terminates, no Lender shall thereafter make any Loans pursuant to such Commitment.

(b)     This Agreement shall terminate upon the irrevocable termination of all Commitments and payment in full of all of the Obligations.  Upon termination of this Agreement Credit Parties shall deliver to Agents and Lenders a release, in form and substance satisfactory to Agents, of all obligations and liabilities of Agents and Lenders and their officers, directors, employees, agents, parents, subsidiaries and affiliates to Credit Parties, and, if any of the Borrowers are obtaining new financing from another lender, Credit Parties shall deliver an indemnification of Agents and Lenders, in form and substance satisfactory to Agents, for checks which Agents have credited to Borrowers' account, but which subsequently are dishonored for any reason or for automatic clearinghouse or wire transfers not yet posted to Borrowers' account.

(c)     Credit Parties may terminate this Agreement at any time but only upon sixty (60) days' prior written notice and prepayment of all Obligations.  Credit Parties may not repay the Revolving Loans and terminate the Revolving Loan Commitments unless all Obligations are repaid at such time.

(d)     If all of the Commitments terminate for any reason (whether by voluntary termination by Borrowers, by reason of the occurrence of an Event of Default or otherwise, but other than as a result of a mandatory prepayment pursuant to Section 2(d)(iv)) prior to the Revolving Loan Term, the entire principal balance, together with accrued and unpaid interest on

any Loans then outstanding shall be immediately due and payable on the effective date of such termination and Borrowers shall pay to Agents, as compensation for the costs of Agents and Lenders being prepared to make funds available to Borrowers under this Agreement, a deferred commitment fee calculated as necessary to achieve a yield (e.g., interest and applicable fees under Section 4) that provides Lenders the internal rate of return they would have received assuming that the Revolving Loans and Term Loan A, interest on the Revolving Loans and Term Loan A and fees had been paid as scheduled herein. In determining the deferred commitment fee, it shall be assumed that: (i) the aggregate Revolving Loan amount during the period from date of prepayment to the end of the Revolving Loan Term was at all times equal to the amount of the average outstanding balance of Revolving Loans during the period from the date of the initial Revolving Loan advance hereunder to the date of prepayment, and (ii) the interest rate applicable to the Revolving Loans and Term Loan A, respectively, during the period from date of prepayment to end of the applicable Term was equal to the average rate applicable to the Revolving Loans and Term Loan A, respectively, during the period from the date of the initial Revolving Loan and Term Loan A, respectively, hereunder to the date of prepayment. For clarity, the deferred commitment fee provided in this Section 10(d) shall be calculated without reference to Term Loan B or the interest to be earned thereon.

(e)     If Term Loan B shall be repaid for any reason (whether by voluntary termination by Borrowers, by reason of the occurrence of an Event of Default or otherwise) prior to the end of the Term Loan B Term, Borrowers shall pay to Agents, for their ratable benefit, a prepayment fee calculated as follows: (A) five percent (5%) of the original principal amount of Term Loan B if such prepayment occurs on or prior to the first anniversary of the date of the advance of Term Loan B, (ii) two percent (2%) of the original principal amount of Term Loan B if such prepayment occurs after the first anniversary but on or prior to the second anniversary of the date of the advance of Term Loan B or (C) one percent (1%) of the original principal amount of Term Loan B if such prepayment occurs at any time after the second anniversary of the date of the advance of Term Loan B. The prepayment fee provided in this Section 10(e) is a separate and independent obligation of Borrowers from the deferred commitment fee provided in Section 10(d).

11.     REPRESENTATIONS AND WARRANTIES.

Each Credit Party, jointly and severally, hereby represents and warrants to each Agent and each Lender, which representations and warranties (whether appearing in this Section 11 or elsewhere) shall be true at the time of such Credit Party's execution hereof and the closing of the transactions described herein or related hereto, shall remain true until the repayment in full and satisfaction of all the Obligations and termination of this Agreement, and shall be remade by each Credit Party at the time each Loan is made pursuant to this Agreement, provided, that representations and warranties made as of a particular date shall be true and correct as of such date.

(a)     Financial Statements and Other Information. The financial statements and other information delivered or to be delivered by any Credit Party to either Agent or any Lender at or prior to the date of this Agreement fairly present in all material respects the financial condition of Credit Parties, and there has been no material adverse change in the financial condition, the operations or any other status of Credit Parties since the date of the financial

33

statements delivered to Agent or any Lender most recently prior to the date of this Agreement. All written information now or heretofore furnished by any Credit Party to either Agent or any Lender is true and correct as of the date with respect to which such information was furnished.

(b)    Locations; Certain Collateral.  The office where each Credit Party keeps its books, records and accounts (or copies thereof) concerning the Collateral, each Credit Party's principal place of business and all of each Credit Party's other places of business, locations of Collateral and post office boxes and locations of bank accounts are as set forth in Schedule 11(b) and at other locations within the continental United States of which Agents have been advised by Borrowers in accordance with Section 12(b)(i).  The Collateral, including, without limitation, the Equipment (except any part thereof which Borrowers shall have advised Agents in writing consists of Collateral normally used in more than one state) is kept, or, in the case of vehicles, based, only at the addresses set forth on Schedule 11(b), and at other locations within the continental United States of which Agents have been advised by Borrowers in writing in accordance with Section 12(b)(i) hereof.  Schedule 11(b) hereto contains a complete listing of all of each Credit Party's (a) Intellectual Property which is subject to registration statutes and licenses of Intellectual Property to which such Credit Party is a party (whether as licensor or licensee), (b) Instruments (other than Instruments deposited for collection in the ordinary course of business), (c) Deposit Accounts, (d) Investment Property, (e) Letter-of-Credit Rights, (f) Chattel Paper, (g) Documents, (h) Commercial Tort Claims, (i) Collateral which is subject to certificate of title statutes, and (j) tangible Collateral located with any bailee, warehousemen or other third parties.

(c)    Loans by Borrower.  No Credit Party or Subsidiary has made any loans or advances to any Affiliate or other Person except for advances authorized hereunder to employees, officers and directors of such Credit Party or Subsidiary for travel and other expenses arising in the ordinary course of such Credit Party's or Subsidiary's business and other loans and advances permitted by Section 13(e).

(d)    Accounts and Inventory.  Each Account or item of Inventory which a Borrower shall, expressly or by implication, request Revolving Loan Administrative Agent to classify as an Eligible Account shall, as of the time such request is made, conform in all respects to the requirements of such classification as set forth in the definition of "Eligible Account" as set forth herein and as otherwise established by Revolving Loan Administrative Agent from time to time.

(e)    Liens.  Each Credit Party is the lawful owner of all Collateral now purportedly owned or hereafter purportedly acquired by such Credit Party, free from all Liens, other than the Permitted Liens.

(f)    Organization, Authority and No Conflict.  Each Credit Party is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing in the State of its organization, its state organizational identification number is as set forth on the Information Certificate and such Credit Party is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary or, if such Credit Party is not so qualified, such Credit Party may cure any such failure without losing any of its rights, incurring any Liens or

34

material penalties, or otherwise affecting either Agent's or any Lender's rights. Each Credit Party has the right and power and is duly authorized and empowered to enter into, execute and deliver this Agreement and the Other Agreements and perform its obligations hereunder and thereunder. Each Credit Party's execution, delivery and performance of this Agreement and the Other Agreements do not conflict with the provisions of such Credit Party, any statute, regulation, ordinance or rule of law, or any agreement, contract or other document which may now or hereafter be binding on such Credit Party, except for conflicts with agreements, contracts or other documents which would not have a Material Adverse Effect on such Credit Party, and such Credit Party's execution, delivery and performance of this Agreement and the Other Agreements shall not result in the imposition of any Lien upon any of such Credit Party's property (other than Permitted Liens) under any existing indenture, mortgage, deed of trust, loan or credit agreement or other agreement or instrument by which such Credit Party or any of its property may be bound or affected.

(g)     Litigation.  Except as disclosed on Schedule 11(g) hereto, there are no actions or proceedings which are pending or, to the best of each Credit Party's knowledge, threatened against any Credit Party or Subsidiary which are reasonably likely to have a Material Adverse Effect on any Credit Party or Subsidiary, and each Credit Party shall, promptly upon becoming aware of any such pending or threatened action or proceeding, give written notice thereof to Agents and Lenders.

(h)     Compliance with Laws and Maintenance of Permits.  Each Credit Party and Subsidiary has obtained all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on such Credit Party or Subsidiary.  Each Credit Party and Subsidiary is in compliance in all material respects with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety) the failure to comply with which would have a Material Adverse Effect on such Credit Party or Subsidiary.

(i)     Affiliate Transactions.  Except as set forth on Schedule 11(i) hereto or as permitted pursuant to Section 13(h) hereof, no Credit Party is conducting, permitting or suffering to be conducted, transactions with any Affiliate other than transactions with Affiliates for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to such Credit Party than the terms upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate.

(j)     Names and Trade Names.  Each Credit Party's name has always been as set forth on the first page of this Agreement and such Credit Party uses no trade names, assumed names, fictitious names or division names in the operation of its business, except as set forth on Schedule 11(j) hereto.

(k)     Equipment.  Except for Permitted Liens, each Credit Party has good and indefeasible and merchantable title to and ownership of all of its Equipment. No Equipment is a Fixture to Real Property unless such Real Property is owned by a Credit Party and is subject to a Mortgage in favor of Agents or, if such Real Property is leased, is subject to a landlord's

35

agreement in favor of Agents on terms acceptable to Agents, or an accession to other personal property unless such personal property is subject to a first priority Lien in favor of Agents.

(l)    Enforceability.  This Agreement and the Other Agreements to which a Credit Party is a party are the legal, valid and binding obligations of such Credit Party and are enforceable against such Credit Party in accordance with their respective terms.

(m)    Solvency.  Each Credit Party is, after giving effect to the transactions contemplated hereby, solvent, able to pay its debts as they become due, has capital sufficient to carry on its business, now owns property having a value both at fair valuation and at present fair saleable value greater than the amount required to pay its debts, and will not be rendered insolvent by the execution and delivery of this Agreement or any of the Other Agreements or by completion of the transactions contemplated hereunder or thereunder.

(n)    Indebtedness.  Except as set forth on Schedule 11(n) hereto, none of Pascagoula Inc., any Credit Party or Subsidiary is obligated (directly or indirectly) for any Indebtedness other than the Loans.  Schedule 11(n) accurately sets forth all required payments of Bankruptcy Claims known to Credit Parties as of the date of this Agreement.

(o)    Margin Security and Use of Proceeds.  No Credit Party or Subsidiary owns any margin securities, and none of the proceeds of the Loans hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

(p)    Parent, Subsidiaries and Affiliates.  Except as set forth on Schedule 11(p) hereto, no Credit Party has any Parents, Subsidiaries or other Affiliates, nor is any Credit Party or Subsidiary engaged in any joint venture or partnership with any other Person.  Schedule 11(p) sets forth a true and complete listing of each class of each Credit Party's and each Subsidiary's Equity Interests, all of which are owned beneficially and of record by the Persons identified on Schedule 11(p).  Except as described on Schedule 11(p), there are no outstanding options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell any Equity Interests or obligations convertible into, or any powers of attorney relating to any Equity Interests in any Credit Party or Subsidiary.  Except as set forth on Schedule 11(p), as of the date hereof, there are no outstanding agreements or instruments binding upon any Credit Party or Subsidiary or any holder of any Equity Interest in any Credit Party or Subsidiary, as the case may be, relating to the ownership or voting of Equity Interests in such Credit Party or Subsidiary.  No class of Equity Interests in any Credit Party or Subsidiary has voting rights other than as set forth on Schedule 11(p).

(q)    No Defaults.  Except as set forth on Schedule 11(q) hereto, no Credit Party or Subsidiary is in default under any material contract, lease or commitment to which it is a party or by which it is bound, nor does any Credit Party know of any dispute regarding any contract, lease or commitment which would have a Material Adverse Effect on such Credit Party or Subsidiary.

36

(r)    Employee Matters.    There are no controversies pending or, to the knowledge of any Credit Party, threatened between any Credit Party or Subsidiary and any of its employees, agents or independent contractors, other than employee grievances arising in the ordinary course of business which would not, in the aggregate, have a Material Adverse Effect on such Credit Party or Subsidiary, and each Credit Party and Subsidiary is in compliance with all federal and state laws respecting employment and employment terms, conditions and practices except for such noncompliance which would not have a Material Adverse Effect on such Credit Party and Subsidiary.

(s)    Intellectual Property.    Each Credit Party and Subsidiary possesses adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue to conduct its business as heretofore conducted by it except to the extent that the failure to possess such items would not have a Material Adverse Effect on such Credit Party or Subsidiary.

(t)    Environmental Matters.    Except as set forth on Schedule 11(t) hereto, no Credit Party or Subsidiary has generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates in any material respect any Environmental Law, or any license, permit, certificate, approval or similar authorization thereunder, and the operations of each Credit Party and Subsidiary comply in all material respects with all Environmental Laws and all licenses, permits, certificates, approvals and similar authorizations thereunder.  There has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person, nor is any pending or, to the best of each Credit Party's knowledge, threatened with respect to any non-compliance with or violation of the requirements of any Environmental Law by any Credit Party or Subsidiary or the release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which would have a Material Adverse Effect on any Credit Party or Subsidiary or its business, operations or assets or any properties at which any Credit Party or Subsidiary has transported, stored or disposed of any Hazardous Materials.  No Credit Party or Subsidiary has any material liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

(u)    ERISA Matters.    Each Credit Party and Subsidiary has paid and discharged all obligations and liabilities arising under ERISA of a character which, if unpaid or unperformed, might result in the imposition of a Lien against any of its properties or assets.

(v)    Eligible Accounts.    With respect to each Account owed to any Borrower (hereinafter, the "applicable Borrower"), as of the date such Account is created and included as an Eligible Account:

(i)    all documents and agreements relating to the Account requested by Revolving Loan Administrative Agent have been delivered to Revolving Loan

37

Administrative Agent with respect to such Account and such documents are true and correct in all material respects;

(ii)    the Account is genuine and in all respects what it purports to be and is not evidenced by a judgment;

(iii)    the Account is for a liquidated amount maturing as stated in a duplicate claim or invoice covering such sale or rendition of Healthcare Services;

(iv)    the Account is not subject to any offset, Lien (other than a Lien of Agents), recoupment, deduction, defense, dispute, counterclaim or any other adverse condition or adjustment of any kind (in each case other than any such item that is taken into account in determining the net amount of such Account) that is known to the applicable Borrower as existing or asserted, and each such Account is absolutely owing to the applicable Borrower and is not contingent in any respect or for any reason;

(v)    there are no facts, events or occurrences which in any way impair the validity or enforceability of any Accounts or tend to reduce the amount payable thereunder from the face amount of the claim or invoice and statements delivered to Revolving Loan Administrative Agent with respect thereto, including, without limitation, the failure of Revolving Loan Administrative Agent to provide Healthcare Services in a manner that complies in all material respects with all laws and regulations applicable to the payment therefor;

(vi)    to the best of each Credit Party's knowledge, the Account Debtor under the Account had the capacity to contract at the time any contract or other document giving rise to the Account was executed;

(vii)    to the best of each Credit Party's knowledge, there are no proceedings or actions which are threatened or pending against any Account Debtor under the Account which might result in any material adverse change in such Account Debtor's financial condition or the collectibility of such Account;

(viii)    the Account has been billed and forwarded to the Account Debtor for payment in accordance with applicable laws and compliance and conformance in all material respects with any and requisite procedures, requirements and regulations governing payment by such Account Debtor with respect to such Account, and such Account if due from a Governmental Account Debtor is properly payable directly to the applicable Borrower;

(ix)    each Borrower has obtained and currently has all certificates of need, certificates of medical necessity, Medicaid and Medicare provider numbers, licenses, permits and authorizations that are necessary in the generation of such Accounts;

(x)    Agents have a perfected, first-priority security interest in such Account to secure the Obligations;

38