**08 C 730**

**JUDGE KENNELLY**
**MAGISTRATE JUDGE ASHMAN**

Exhibit B

Part 4

(xi)   the aging of such Eligible Account, as reflected in the information submitted to Revolving Loan Administrative Agent, reflects the age of such Eligible Account from the date of service and not from the date of billing or any re-billing of the Eligible Account;

(xii)   no Borrower has made, or will make, any agreement with any Account Debtor for any extension of the time for payment of the Account, any compromise or settlement for less than the full amount thereof, any release of any Account Debtor from liability therefor, or any deduction therefrom except a discount or allowance for prompt or early payment allowed by the applicable Borrower in the ordinary course of its business consistent with its historical practices and as previously disclosed to Revolving Loan Administrative Agent in writing;

(xiii)   all information relating to such Account that has been delivered to Revolving Loan Administrative Agent is true and correct in all material respects, such that with respect to each such Account that has been billed, the applicable Borrower has delivered or is delivering to the Account Debtor all requested supporting claim documents and all information set forth in the bill and supporting claim documents is true, complete and correct in all material respects;

(xiv)   if necessary, the applicable Borrower will rebill the Account Debtor or, with respect to Account Debtors that are Governmental Authority, if requested by the primary servicer, cooperate with such servicer to rebill such Account Debtor;

(xv)   such Account is (i) payable in the amount identified by the applicable Borrower; or, (ii) to the knowledge of each Borrower the legally enforceable obligation of such Account Debtor, and (iii) an account receivable or general intangible within the meaning of the UCC of the state in which the applicable Borrower is "located" (within the meaning of such term in the UCC);

(xvi)   no such Account (i) after giving effect to the provisions of the UCC, requires the approval of any third person for such Account to be assigned to Revolving Loan Administrative Agent hereunder, or (ii) is past, or within 180 days of, the statutory limit for collection applicable to the Account Debtor;

(xvii)   no Borrower has any guaranty of, letter of credit support for, or collateral security for, such Account, other than any such guaranty, letter of credit or collateral security to which Agents have a Lien;

(xviii)   the services constituting the basis of such Account (i) were medically necessary for the patient and (ii) at the time such services were rendered, were fully covered by the insurance policy or contract obligating the applicable Account Debtor to make payment with respect to such Account (and the applicable Borrower has verified such determination), and (iii) the patient has received such services in the ordinary course of the applicable Borrower's business;

(xix)   the fees and charges charged for the services constituting the basis for such Account were when rendered and are currently consistent with (i) the usual,

39

customary and reasonable fees charged by the applicable Borrower or (ii) pursuant to negotiated fee contracts, or imposed fee schedules, with or by the applicable Account Debtors;

(xx) the insurance policy or contract obligating an Account Debtor to make payment (i) does not prohibit the transfer of such payment obligation from the patient to the applicable Borrower and (ii) is and was in full force and effect and applicable to the patient at the time the services constituting the basis for such Account were performed;

(xxi) if requested by Revolving Loan Administrative Agent, a copy of each related contract and provider agreement to which the applicable Borrower is a party has been delivered to Revolving Loan Administrative Agent unless the applicable Borrower, prior to the related funding date, shall have certified to Revolving Loan Administrative Agent that such delivery is prohibited by the terms of the contract or by law, and the circumstances of such prohibition; and

(xxii) such Account was (or if unbilled, will be (nothing herein implying any obligation of Revolving Loan Administrative Agent to make advances in respect of unbilled Accounts)) in any event billed no later than thirty (30) days after the date the services or goods giving rise to such Account were rendered or provided, as applicable, and each bill (other than bills delivered prior to the date that the lockbox agreements are in effect), contains an express direction requiring the Account Debtor to remit payments to the applicable lockbox linked to the applicable Account Debtor Collection Lockbox Account or Governmental Account Debtor Lockbox Account.

If a breach of any of the representations or warranties contained herein relating to an Account may, in the reasonable credit judgment of Revolving Loan Administrative Agent have a material adverse effect upon the validity, legality or collectibility of such Account, then such Account shall no longer be deemed an "Eligible Account".

(w) Reimbursement; Nongovernmental Payors. Each Credit Party and Subsidiary has provided to Agents copies of all participation agreements required by Agents with HMOs, insurers, third-party payors, and preferred provider organizations with respect to the business operations of such Credit Party and Subsidiary. The Healthcare Facilities operated by each Credit Party and Subsidiary and the services provided at such Healthcare Facilities are qualified for participation in the Government Reimbursement Programs, and each Credit Party and Subsidiary is entitled to reimbursement under the Government Reimbursement Programs for services rendered at such Healthcare Facilities to qualified beneficiaries, and each Credit Party and Subsidiary complies with the conditions of participation in all Government Reimbursement Programs and related contracts. Each Credit Party and Subsidiary is in compliance in all material respects with contracts with Account Debtors other than Governmental Account Debtors and is entitled to reimbursement under such contracts.

(x) <u>Compliance with Healthcare Regulations</u>.

(i) Each Credit Party, Subsidiary, and Manager has timely filed or caused to be timely filed, all cost reports and other reports of every kind whatsoever required by a Government Reimbursement Program, to have been filed or made with respect to the business operations of such Credit Party or Subsidiary. Except as set forth on <u>Schedule 11(x)</u>, there are no claims, actions or appeals pending (and no Credit Party or Subsidiary has filed any claims or reports which should result in any such claims, actions or appeals) before any Governmental Authority pertaining to such Credit Party's or Subsidiary's business operations including, without limitation, any intermediary or carrier, the Provider Reimbursement Review Board or the Administrator of CMS, with respect to any state or federal Medicare or Medicaid cost reports or claims filed by such Credit Party or Subsidiary, or any disallowance by any Governmental Authority in connection with any audit of such cost reports;

(ii) Each Credit Party, Subsidiary and Manager has obtained all necessary accreditations to operate its business as now conducted, and currently is in compliance with all statutory and regulatory requirements applicable to it, the failure of which would have a Material Adverse Effect upon such Credit Party or Subsidiary;

(iii) Except as set forth on <u>Schedule 11(x)</u> hereto, no Credit Party, Subsidiary, or Manager is currently nor has in the past been subject to:

(1) any investigation, inspection or inquiry by a Governmental Authority related to any Healthcare Authorizations of any Credit Party or Subsidiary;

(2) any civil or criminal investigations, inquiries or audits by or on behalf of any Government Reimbursement Program or other Payor involving and/or related to any Healthcare Regulations or any contractual provisions concerning healthcare fraud and abuse to which any Credit Party is subject; or

(3) any federal, state or private payor inquiry, investigation, inspection or audit regarding any Credit Party or Subsidiary or their activities, including, without limitation, any federal, state or private payor inquiry or investigation of any Person having "ownership, financial or control interest" in any Credit Party or Subsidiary (as that term is defined in 42 C.F.R. § 420.201 *et seq.*) involving and/or related to healthcare fraud and abuse, false claims under 31 U.S.C. §§ 3729-3731 or any similar contractual prohibition, or any qui tam action brought pursuant to 31 U.S.C. § 3729 *et seq.*;

(iv) No director, officer, shareholder, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any Credit Party or Subsidiary, or Affiliate:

(1) except as set forth on <u>Schedule 11(x)</u> has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. § 1320a-7a;

41

(2) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b);

(3) except as set forth on Schedule 11(x) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518, including without limitation any of the following categories of offenses:

a. criminal offenses relating to the delivery of an item or service under any Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b) or healthcare benefit program (as that term is defined in 18 U.S.C. § 24b);

b. criminal offenses under federal or state law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service;

c. criminal offenses under federal or state law relating to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickbacks, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state or local governmental agency;

d. federal or state laws relating to the interference with or obstruction of any investigations into any criminal offenses described in (1) through (3) above; or

e. criminal offenses under federal or state law relating to the unlawful manufacturing, distribution, prescription or dispensing of a controlled substance; or

(4) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 *et seq.*

(v) each Credit Party and Subsidiary is and shall continue to be in compliance with all applicable laws relating to its relationships with physicians except for any non-compliance which could not materially adversely affect its ability to collect on its Accounts or repay the Obligations;

(vi) each Credit Party, Subsidiary and Manager and their employees and contractors (other than contracted agencies), in the exercise of their duties on behalf of any Credit Party, Subsidiary and Manager, is and shall continue to be in compliance with all laws, rules, regulations, orders, decrees and directions of any Governmental Authority (including, without limitation, the Social Security Act, as amended, the rules and regulations promulgated by CMS), and any state laws applicable to the collections on

Accounts, any contracts relating thereto or any other Collateral, or otherwise applicable to its business and properties, a violation of which could materially adversely affect its ability to collect on its Accounts or repay the Obligations;

(vii) All persons providing professional health care services for or on behalf of any Credit Party or Subsidiary (either as an employee or independent contractor) are appropriately licensed in every jurisdiction in which they hold themselves out as professional health care providers; and

(viii) Except as set forth on Schedule 11(x) hereto, none of any Credit Party's or Subsidiary's state and local licenses, permits, registrations, certifications and other approvals relating to providing healthcare services and other services provided by such Credit Party or Subsidiary have been suspended, revoked, limited or denied renewal at any time.

(y) Other Healthcare Regulatory Matters. Commencing six (6) months after the date of this Agreement, each Credit Party and Subsidiary has developed and implemented a current and effective compliance program. As of the Closing Date, each Credit Party and Subsidiary (i) is not a party to a corporate integrity agreement, (ii) has no reporting obligations pursuant to a settlement agreement, plan of correction, or other remedial measure entered into with a Governmental Authority, (iii) except as set forth on Schedule 11(y) hereto, is not currently, or to each Credit Party's best knowledge, has not been the subject of any investigation conducted by any federal or state enforcement agency, including, without limitation, an investigation involving compliance with Healthcare Regulations, (iv) to each Credit Party's best knowledge, has not been a defendant in any qui tam/false claims act litigation and (v) has not been served with or received any written search warrant, subpoena, civil investigative demand or contact letter from any federal or state enforcement agency related to the business operations of any Credit Party or Subsidiary.

(z) Licenses, Permits, Etc. Each Credit Party, Subsidiary and Manager has all necessary federal, state and local licenses, permits, registrations, certifications and other approvals required in order to conduct any healthcare activity in which it is currently engaged; the failure of any Credit Party, Subsidiary or Manager to have such licenses, permits, registrations, certifications and other approvals that would have a Material Adverse Effect on any Credit Party or Subsidiary and any Person that provides any healthcare services for or on behalf of any Credit Party or Subsidiary (either as an employee or independent contractor) holds the required federal, state and local licenses that are necessary to legally perform such services and are not suspended or limited in any way; and, except as set forth on Schedule 11(z) hereto, each Credit Party and Subsidiary is in good standing with the respective governmental, quasi-governmental and other third-party payors and regulatory agencies that are involved in such healthcare activities.

(aa) Healthcare Authorizations. All Healthcare Authorizations have been duly obtained and are in full force and effect without any known conflict with the rights of others and free from any restrictions. Except as set forth on Schedule 11(aa) hereto, no Credit Party or Subsidiary has received any written notice or other written communications from any Governmental Authority regarding (i) any revocation, withdrawal, suspension, termination or

modification of, or the imposition of any material conditions with respect to, any Healthcare Authorizations, (ii) any violation by any Credit Party or Subsidiary of any applicable Law or (iii) any other limitations on the conduct of business by any Credit Party or Subsidiary.

(bb) <u>HIPAA Compliance</u>. To the extent that and for so long as any Credit Party or Subsidiary is a "covered entity" as such term is defined under the requirements and implementing regulations at 45 Code of Federal Regulations ("**C.F.R.**") Parts 160-64 for the Administrative Simplification provisions of Title II, Subtitle F of the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), each Credit Party and Subsidiary (i) has undertaken or will promptly undertake all necessary surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of its business and operations required by HIPAA and/or that could be adversely affected by the failure of such Credit Party or Subsidiary to be HIPAA Compliant (as defined below); (ii) has developed a detailed plan and time line for becoming HIPAA Compliant (a "**HIPAA Compliance Plan**"); and (iii) has implemented those provisions of such HIPAA Compliance Plan in all material respects necessary to ensure that each Credit Party and Subsidiary becomes HIPAA Compliant. For purposes hereof, "**HIPAA Compliant**" shall mean that each Credit Party and Subsidiary (x) is or will be in compliance with each of the applicable requirements of the so-called "**Administrative Simplification**" provisions of HIPAA on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "**HIPAA Compliance Date**") and (y) is not, and could not reasonably be expected to become, as of any date following any such HIPAA Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to have a Material Adverse Effect on any Credit Party or Subsidiary.

(cc) <u>Collective Enterprise</u>. Credit Parties are engaged in the businesses of the management and operation of nursing home facilities as of the date hereof, as well as in certain other businesses. These operations require financing on a basis such that the credit supplied can be made available from time to time to Borrowers, as required for the continued successful operation of Credit Parties taken as a whole. Credit Parties have requested Agents and Lenders make credit available hereunder to Borrowers primarily for the purposes of <u>Section 12(g)</u> and generally for the purposes of financing the operations of Credit Parties. Each Credit Party expects to derive benefit (and the Board of Directors of each Credit Party has determined that such Credit Party may reasonably be expected to derive benefit), directly or indirectly, from a portion of the credit extended by Agents and Lenders hereunder, both in its separate capacity and as a member of the group of companies, since the successful operation and condition of each Credit Party is dependent on the continued successful performance of the functions of the group as a whole. Each Credit Party acknowledges that, but for the agreement of each of the other Credit Parties to execute and deliver this Agreement, Agents and Lenders would not have made available the credit facilities established hereby on the terms set forth herein.

(dd) <u>Subordinated Debt</u>. The subordination provisions of the Subordinated Debt are enforceable against the holders of the Subordinated Debt by the Agents and the Lenders. All Obligations constitute senior debt entitled to the benefits of the subordination

44

provisions contained in the Subordinated Debt. Each Credit Party acknowledges that the Agents and each Lender are entering into this Agreement and are extending the Commitments and making the Loans in reliance upon the subordination provisions of the Subordinated Debt and this Section 11(dd).

(ee) Investment Company Act. No Credit Party or Subsidiary is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," within the meaning of the Investment Company Act of 1940.

12. AFFIRMATIVE COVENANTS.

Until payment and satisfaction in full of all Obligations and termination of this Agreement, unless Credit Parties obtain Requisite Lenders' prior written consent waiving or modifying any of Credit Parties' covenants hereunder in any specific instance, each Credit Party covenants and agrees as follows:

(a) Maintenance of Records. Each Credit Party shall, and shall cause each Subsidiary to, at all times keep accurate and complete books, records and accounts with respect to all of its business activities, in accordance with sound accounting practices and GAAP consistently applied, and shall keep such books, records and accounts, and any copies thereof, only at the addresses indicated for such purpose on Schedule 11(b).

(b) Notices. Each Credit Party shall:

(i) Locations. Promptly (but in no event less than ten (10) days prior to the occurrence thereof) notify Agents of the proposed opening of any new place of business or new location of Collateral, the closing of any existing place of business or location of Collateral, any change of in the location of any Credit Party's books, records and accounts (or copies thereof), the opening or closing of any post office box, the opening or closing of any bank account or, if any of the Collateral consists of Goods of a type normally used in more than one state, the use of any such Goods in any state other than a state in which such Credit Party has previously advised Agents that such Goods will be used.

(ii) Eligible Accounts and Inventory. Promptly upon becoming aware thereof (but in no event later than three (3) days after so becoming aware), notify Revolving Loan Administrative Agent if any Account identified by any Borrower to Revolving Loan Administrative Agent as an Eligible Account becomes ineligible for any reason.

(iii) Litigation and Proceedings. Promptly upon becoming aware thereof (but in no event later than three (3) days after so becoming aware), notify Agents of (i) any actions or proceedings which are pending or threatened against any Credit Party or Subsidiary and (ii) any Commercial Tort Claims of any Credit Party which may arise, either of which involve an amount in controversy in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00), which notice shall constitute such Credit Party's authorization to amend Schedule 11(b) to add such Commercial Tort Claim.

(iv)  Names and Trade Names. Notify Agents at least ten (10) days prior to any change of its name or the use of any trade name, assumed name, fictitious name or division name not previously disclosed to Agents in writing.

(v)  ERISA Matters. Notify Agents within ten (10) days after (x) the occurrence of any "reportable event" (as defined in ERISA) which might result in the termination by the Pension Benefit Guaranty Corporation (the "**PBGC**") of any employee benefit plan ("**Plan**") covering any officers or employees of any Credit Party or Subsidiary, any benefits of which are, or are required to be, guaranteed by the PBGC, (y) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor or (z) its intention to terminate or withdraw from any Plan.

(vi)  Healthcare Compliance. Promptly upon becoming aware thereof (but in no event later than one (1) day after becoming aware), notify Agents, following the occurrence of any of the following facts, events or circumstances, whether threatened, existing or pending, together with such supporting data and information as shall be necessary to fully explain to Agents the scope and nature of the fact, event or circumstance, and shall provide to Administrative Agents within two (2) Business Days of either Agent's request, such additional information as such Agent shall request regarding such disclosure:

(1)  any Credit Party has become subject to any federal, state, local governmental or private payor civil or criminal investigations, inquiries, validation review, program integrity review or reimbursement audits or statement of deficiencies involving and/or related to its compliance with Healthcare Laws (including, without limitation, an inquiry or investigation of any Person having "ownership, financial or control interest" in any Borrowers (as that phrase is defined in 42 C.F.R. §420.201 *et seq.*)) which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(2)  that an owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any Credit Party: (i) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. § 1320a-7a or is the subject of a proceeding seeking to assess such penalty; (ii) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b) or is the subject of a proceeding seeking to assess such penalty; (iii) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; or (iv) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 *et seq.*;

(3)  any claims, actions or appeals before any commission, board or agency charged with administering Healthcare Regulations or programs

operated under Healthcare Regulations (including, without limitation, any Medicare fiscal intermediary or carrier, the Provider Reimbursement Review Board or the Administrator of CMS) with respect to any state or federal Medicare or Medicaid cost reports or claims filed by any Credit Party, or any disallowance by any commission, board or agency in connection with any audit of such cost reports;

(4) any validation review, program integrity review or reimbursement audits related to any Credit Party by any commission, board or agency in connection with the Medicare or Medicaid programs;

(5) any restrictions, deficiencies, required plans of correction actions or other such remedial measures with respect to Medicare and Medicaid certifications or state or local licensure of any Borrower;

(6) any liability in respect of amounts received by any Credit Party or Subsidiary for the purchase or improvement of any real property under restricted or conditioned grants or donations, including, without limitation, monies received under the Public Health Service Act, 42 U.S.C. § 291, *et seq.*;

(7) the voluntary disclosure by any Credit Party to the Office of the Inspector General of the United States Department of Health and Human Services, a Medicare fiscal intermediary or carrier, any state's Medicaid program or any other Government Reimbursement Program of matters relating to any Credit Party's submissions of claims to any Payor;

(8) receipt by any Credit Party of any notice or communication from the Joint Commission on Accreditation of Healthcare Organizations that any Healthcare Facility is (i) subject to or is required to file a plan of correction with respect to any accreditation survey, or (ii) in danger of losing its accreditation due to a failure to comply with a plan of correction;

(9) any charges of patient abuse or licensing violations involving a Credit Party;

(10) any health care survey report related to licensure or certification (including, without limitation, an annual or biannual Medicare or Medicaid certification survey report) which includes any statement of deficiencies pertaining to any Borrower or any of the Locations (whether via form CMS 2567 or otherwise);

(11) without duplication, any failure of any Credit Party to comply with any covenants or conditions in this Section 12;

(12) any revocation, suspension, termination, probation, restriction, limitation, denial, or nonrenewal affecting any Credit Party with respect to any Medicare and/or Medicaid participation or provider agreement, certification, billing number, assignment (via form CMS 855 or otherwise),

47

billing agent or electronic funds transfer instruction, including, without limitation, any denial of payment for new admissions;

(13) any revocation, suspension, termination, probation, restriction, limitation, denial or nonrenewal affecting any Borrower with respect to any participation or provider agreement with any Payor other than Medicaid or Medicare (including, without limitation, Blue Cross/Blue Shield, Aetna, etc.), and any other private commercial insurance, healthcare service contractor, provider network, managed care program and employee assistance program; and/or

(14) without limitation of any of the foregoing, any Credit Party's receipt of material information concerning any investigation by the Tennessee Bureau of Investigation or other Governmental Authority concerning any Credit Party's practices with respect to the completion and submission of Pre-Admission Evaluation intake forms or similar forms.

(vii) Environmental Matters. Immediately notify Agents upon becoming aware of any investigation, proceeding, complaint, order, directive, claim, citation or notice with respect to any noncompliance with or violation of the requirements of any Environmental Law by any Credit Party or Subsidiary or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which affects any Credit Party or Subsidiary or its business operations or assets or any properties at which any Credit Party or Subsidiary has transported, stored or disposed of any Hazardous Materials unless the foregoing could not reasonably be expected to have a Material Adverse Effect on any Credit Party or Subsidiary.

(viii) Default: Material Adverse Change. Immediately advise Agents of any material adverse change in the business, property, assets, prospects, operations or condition, financial or otherwise, of any Credit Party or Subsidiary, the occurrence of any Default or Event of Default hereunder.

(ix) Indebtedness. Notify Agents within five (5) days of any default or any event which, with the giving of notice or lapse of time, or both, would constitute a default, under any subordination or intercreditor agreement relative to any Indebtedness (other than the Loans or other Obligations), or any agreement, instrument or document evidencing or relating to any Indebtedness (other than the Loans or other Obligations), and a certificate of an Authorized Officer of Credit Parties or any Credit Party specifying the nature thereof and Credit Parties' proposed response thereto, in reasonable detail.

(x) Mortgage/Lease Defaults. Notify Agents within five (5) days of any default or any event which, with the giving of notice or lapse of time, or both, would constitute a default, under any Real Property lease or mortgage to which any Credit Party is a party, or any agreement, instrument or document evidencing or relating thereto.

All of the foregoing notices shall be provided by Credit Parties to Agents and/or Lenders, as applicable, in writing.

CHICAGO/#1492002.8

(c) <u>Compliance with Laws and Maintenance of Permits</u>. Each Credit Party shall, and shall cause each Subsidiary and Manager, as applicable, to, maintain all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a Material Adverse Effect on any Credit Party or Subsidiary, and each Credit Party shall, and shall cause each Subsidiary to, remain in compliance with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety), the failure to comply with which would have a Material Adverse Effect on any Credit Party or Subsidiary. Following any determination by Agents that there is noncompliance, or any condition which requires any action by or on behalf of any Credit Party or Subsidiary in order to avoid noncompliance, with any Environmental Law, at Borrowers' expense, each Credit Party shall cause an independent environmental engineer acceptable to Agents to conduct such tests of the relevant site(s) as are appropriate and prepare and deliver a report setting forth the results of such tests, a proposed plan for remediation and an estimate of the costs thereof.

(d) <u>Inspection and Audits</u>. Each Credit Party shall, and shall cause each Subsidiary to, permit Agents and Lenders, or any Persons designated by either Agent, to call at its places of business at any reasonable times upon reasonable notice (except that no notice shall be necessary during the existence of an Event of Default) and, without hindrance or delay, to inspect the Collateral and to inspect, audit, check and make extracts from its books, records, journals, orders, receipts and any correspondence and other data relating to its business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning its business as Agents may consider reasonable under the circumstances. Each Credit Party shall, and shall cause each Subsidiary to, furnish to Agents such information relevant to either Agent or any Lender's rights under this Agreement and the Other Agreements as such Agent shall at any time and from time to time request. Revolving Loan Administrative Agent, through its officers, employees or agents, shall have the right, at any time and from time to time, in such Agent's name, to verify the validity, amount or any other matter relating to any of Borrowers' Accounts, by mail, telephone, telecopy, electronic mail or otherwise, provided that, prior to the occurrence of an Event of Default, such Agent shall conduct such verification in the name of a nominee of such Agent or in a Borrower's name. Each Credit Party authorizes Agents to discuss the affairs, finances and business of Credit Parties and their Subsidiaries with any of their officers, employees or directors, Affiliates or independent public accountants. Any such discussions shall be without liability to either Agent or any Lender or to such independent public accountants. Borrowers shall pay to each Agent all customary fees and all costs and out-of-pocket expenses incurred by such Agent in the exercise of its rights hereunder, and all of such fees, costs and expenses shall constitute Obligations hereunder, shall be payable on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(e) <u>Insurance</u>. Each Credit Party shall:

(i) Keep the Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured against by Persons engaged in businesses similar to that of such Credit Party, with such

49

companies, in such amounts, with such deductibles and under policies in such form as shall be satisfactory to Agents. Certificates of insurance or, if requested by Agents, original (or certified) copies of such policies of insurance have been or shall be, within ninety (90) days of the date hereof, delivered to Agents, together with evidence of payment of all premiums therefor, and shall contain an endorsement, in form and substance acceptable to Agents, showing loss under such insurance policies payable to both Agents, for each Agent's benefit and the benefit of Lenders. Such endorsement, or an independent instrument furnished to Agents, shall provide that the insurance company shall give Agents at least thirty (30) days' written notice before any such policy of insurance is altered or canceled and that no act, whether willful or negligent, or default of any Credit Party or any other Person shall affect the right of Agents to recover under such policy of insurance in case of loss or damage. In addition, each Credit Party shall cause to be executed and delivered to Agents an assignment of proceeds of its business interruption insurance policies. Each Credit Party hereby directs all insurers under all policies of insurance to pay all proceeds payable thereunder directly to Agents. Each Credit Party irrevocably makes, constitutes and appoints Agents (and all officers, employees or agents designated by Agents) as such Credit Party's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of such Credit Party on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and making all determinations and decisions with respect to such policies of insurance, provided however, that if no Event of Default shall have occurred and be continuing, such Credit Party may make, settle and adjust claims involving less than $25,000 in the aggregate without Agents' consent.

(ii) Maintain, at its expense, such public liability and third-party property damage insurance as is customary for Persons engaged in businesses similar to that of Credit Party with such companies and in such amounts with such deductibles and under policies in such form as shall be satisfactory to Agents and certificates of insurance or, if requested by Agents, original (or certified) copies of such policies have been or shall be, within ninety (90) days after the date hereof, delivered to Agents, together with evidence of payment of all premiums therefor; each such policy shall contain an endorsement showing both Agents as additional insured thereunder and providing that the insurance company shall give Agents at least thirty (30) days' written notice before any such policy shall be altered or canceled.

If any Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium relating thereto, then Agents, without waiving or releasing any obligation or default by Credit Parties hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Agents deem advisable. Such insurance, if obtained by Agents, may, but need not, protect Credit Parties' interests or pay any claim made by or against any Credit Party with respect to the Collateral. Such insurance may be more expensive than the cost of insurance Credit Parties may be able to obtain on their own and may be cancelled only upon Credit Parties providing evidence that they have obtained the insurance as required above. All sums disbursed by Agents in connection with any such actions, including, without limitation, court costs, expenses, other charges relating thereto and reasonable

attorneys' fees, shall constitute Loans hereunder, shall be payable on demand by Borrowers to Agents and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

(f) <u>Collateral</u>. Each Credit Party shall keep the Collateral in good condition, repair and order and shall make all necessary repairs to the Equipment and replacements thereof so that the operating efficiency and the value thereof shall at all times be preserved and maintained in all material respects. Each Credit Party shall permit Agents and Lenders to examine any of the Collateral at any reasonable time and wherever the Collateral may be located and each Credit Party shall, immediately upon request therefor by Agents, deliver to Agents any and all evidence of ownership of any of the Equipment, including, without limitation, certificates of title and applications of title. Each Credit Party shall, at the request of Agents, indicate on its records concerning the Collateral a notation, in form satisfactory to Agents, of the security interest of Agents hereunder. If, prior to the termination of this Agreement, any Credit Party shall obtain rights to any new Collateral of the type described in the last sentence of Section 11(b), such Credit Party shall notify Agents in writing (with reasonable detail) of such changes at least once every thirty (30) days. Each Credit Party hereby authorizes Agents to unilaterally modify this Agreement by amending Schedule 11(b) to include any such Collateral. Notwithstanding the foregoing, Borrower hereby agrees that Agents' security interest shall extend to all such Collateral, regardless of whether Agents actually amend Schedule 11(b).

(g) <u>Use of Proceeds</u>. All monies and other property obtained by any Borrower from Agents and Lenders pursuant to this Agreement shall be used first for repayment of existing indebtedness of Prior Lender until paid in full; and then, to the extent that any excess funds remain: (i) for payment of any payments of claims due and payable pursuant to the Bankruptcy Confirmation Order or the Bankruptcy Plan of Reorganization, and (ii) for business purposes of Borrower.

(h) <u>Taxes</u>. Each Credit Party shall, and shall cause each Subsidiary to, file all required tax returns and pay all of its taxes when due, subject to any extensions granted by the applicable taxing authority, including, without limitation, taxes imposed by federal, state or municipal agencies, and shall cause any Liens for taxes to be promptly released; provided, that any Credit Party or Subsidiary shall have the right to contest the payment of such taxes in good faith by appropriate proceedings so long as (i) the amount so contested is shown on its financial statements; (ii) the contesting of any such payment does not give rise to a Lien for taxes; (iii) it keeps on deposit with Revolving Loan Administrative Agent (such deposit to be held without interest) or (if it is a Borrower) a reserve is maintained against its availability to borrow money under Section 2(a), in either case, in an amount of money which, in the commercially reasonable (from the perspective of a secured asset-based lender) business judgment, exercised in good faith, of Revolving Loan Administrative Agent, is sufficient to pay such taxes and any interest or penalties that may accrue thereon; and (iv) if it fails to prosecute such contest with reasonable diligence, Revolving Loan Administrative Agent may apply the money so deposited in payment of such taxes. If any Credit Party or Subsidiary fails to pay any such taxes and in the absence of any such contest by it, Revolving Loan Administrative Agent may (but shall be under no obligation to) advance and pay any sums required to pay any such taxes and/or to secure the release of any Lien therefor, and any sums so advanced by Revolving Loan Administrative Agent shall constitute Loans hereunder, shall be payable by Borrowers to Revolving Loan

Administrative Agent on demand and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

    (i)    Intellectual Property. Each Credit Party shall, and shall cause each Subsidiary to, maintain adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and trade names to continue its business as heretofore conducted by it or as hereafter conducted by it unless the failure to maintain any of the foregoing could not reasonably be expected to have a Material Adverse Effect on any Credit Party or Subsidiary.

    (j)    Government Contracts. For any contract or agreement between any Credit Party and any Account Debtor that is subject to the Federal Assignment of Claims Act, as amended (31 U.S.C. §3727) or any similar state or local law (a "**Government Contract**"), each Borrower and, during the existence of an Event of Default, each other Credit Party agrees to comply with the following covenants and procedures:

        (i)    such Borrower shall give Revolving Loan Administrative Agent written notice of such Borrower's execution of or receipt of an award of a Government Contract before including it as an Eligible Account;

        (ii)    if requested by Revolving Loan Administrative Agent, each Credit Party shall execute and deliver to Revolving Loan Administrative Agent, within ten (10) Business Days of Revolving Loan Administrative Agent's request, a separate collateral assignment of any Government Contract in form and content reasonably satisfactory to such Agent and using forms provided by Revolving Loan Administrative Agent;

        (iii)    Revolving Loan Administrative Agent shall have the right to send to the Account Debtor in respect of such Government Contract such notices, and request such acknowledgments of the Account Debtor, as Revolving Loan Administrative Agent deems necessary to cause such Account Debtor to recognize the assignment of the Accounts and payment rights in respect thereof to Revolving Loan Administrative Agent, for its benefit and the benefit of Lenders, as the first and only claim against such Accounts, in accordance with the Federal Assignment of Claims Act, as amended (31 U.S.C. § 3727) or any similar state or local law. Each Credit Party shall cooperate with Revolving Loan Administrative Agent in sending and procuring such notices and acknowledgments; and

        (iv)    No Credit Party shall suffer or permit to exist any notice or claim against Accounts under a Government Contract, other than notices and claims of Revolving Loan Administrative Agent.

    (k)    Billing and Collection System. Credit Parties shall maintain one or more standard and modern billing and collection systems in conformity with commercially reasonable practices in their industry. Each Credit Party shall notify Agents in writing if any Credit Party modifies or changes its billing and collection system or modifies or terminates any agreement presently existing, or at any time hereafter enters into with any third-party provider and/or service bureau for the preparation and/or storage of such Credit Party's billing and collection

system. Each Credit Party shall provide electronic access to Agents to its billing and collection system, on a read-only basis, for purposes of permitting Agents to inspect and verify billing and collections transactions and related data in connection with the Collateral, from time to time.

(l) <u>Chief Financial Officer</u>. Credit Parties shall employ a Chief Financial Officer within sixty (60) days of the date hereof whom shall be reasonably acceptable to the Agents.

(m) <u>Corporate Compliance Program</u>. Within six (6) months of the Closing Date, each Credit Party shall have developed and implemented, and shall thereafter maintain during the Revolving Loan Term and maintain a corporate health care regulatory compliance program ("CCP") which allows Agents and/or any of Agents' outside consultants from time to time review such CCP, and which includes at least the following components, without limitation: (A) standards of conduct and procedures that describe compliance policies regarding Laws with an emphasis on prevention of fraud and abuse; (B) specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (C) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including, without limitation, fraud and abuse Laws and illegal billing practices; (D) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including, without limitation, publicizing a report system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (E) disciplinary guidelines and consistent enforcement of compliance policies including, without limitation, discipline of individuals responsible for the failure to detect violations of the CCP; and (F) mechanisms to immediately respond to detected violations of the CCP. The requirements of this <u>Section 12(m)</u> shall remain in force at all times during the term of this Agreement and while any portion of the Obligations remain outstanding.

(n) <u>Regulatory Covenants</u>.

(i) From time to time, upon the request of Agents, regardless of whether or not an Event of Default hereunder or under the other Loan Documents is then continuing, Borrowers shall, and shall cause each Subsidiary and Manager to complete, execute and deliver to applicable Governmental Authority any applications, notices, documentation, and other information necessary or desirable, in Agents' judgment, to permit such Borrowers, Subsidiary or Managers to obtain, maintain or renew any one or more of the Healthcare Authorizations for any Healthcare Facility and, to the extent permitted by applicable law, to obtain, maintain or renew any other provider agreements or governmental authority then necessary or desirable for the operation of any Healthcare Facility. Upon demand by either Agent, Credit Parties shall also take such other action and cause each Subsidiary and/or Manager to take such other action necessary or desirable, in such Agent's sole judgment, to permit the applicable Borrower, Subsidiary or Manager to use, operate and maintain any Healthcare Facility for its current use.

(ii) Following an Event of Default, in addition to the requirements set forth in (i) above, Credit Parties agree (and shall cause any Manager that is not a Credit Party to agree) to assist Agents in the appointment of a replacement operator (and in