**08 C 730**

**JUDGE KENNELLY**
**MAGISTRATE JUDGE ASHMAN**

Exhibit B

Part 5

obtaining any Governmental Authorization therefor) to operate the Healthcare Facilities or in discontinuing operations of any of the Healthcare Facilities so that Agents may foreclose on, and take possession of, the Collateral. If any Credit Party fails to comply with the provisions of this paragraph (ii) for any reason, such Credit Party hereby irrevocably appoints Agents and its respective designees as such Credit Party's attorney-in-fact, with full power of substitution, for the purpose of taking such action as necessary to appoint an receiver and obtain governmental approval therefor. The foregoing power of attorney is coupled with an interest and is irrevocable and either Agent may exercise its rights thereunder in addition to any other remedies which Agents may have against any Credit Party as a result of any Credit Party's breach of the obligations contained in this Section 12(n).

(iii) In the event of foreclosure by Agents, Credit Parties agree (and shall cause any Manager that is not a Credit Party to agree) to cooperate with Agents to permit Agents to take any such actions necessary to protect the interests of Agents and the Lenders including, but not limited to any of the actions set forth in paragraphs (i) and (ii) above, as well as to permit Agents or their designee (including a replacement operator) to obtain, maintain or renew any one or more of the Healthcare Authorizations for any Healthcare Facilities (or to become the owner of the existing Healthcare Authorizations for any Healthcare Facilities) and, to the extent permitted by law, to obtain any other provider agreements or Governmental Authorizations then necessary or desirable for the operation of any Healthcare Facilities by Agents or Agents' designee for their current use (including, without limitation, any applications in respect of a change of ownership of the existing Healthcare Facilities and/or Healthcare Authorizations, as appropriate, or for change of control of the owner of the Healthcare Facilities and/or Healthcare Authorizations, as appropriate). To the extent permitted by applicable law, in the event of foreclosure by either Agent, (x) Agents are hereby authorized (without the consent of any Credit Party or any Manager that is not a Credit Party) to submit any such applications, notices, documentation or other information which Borrowers caused to be delivered to Agents in accordance with the above provisions to the applicable Governmental Authorities, or to take such other steps as either Agent may deem advisable to obtain, maintain or renew any Healthcare Authorizations or other Governmental Authorizations in connection with the operation of the Healthcare Facilities for their current use, and each Credit Party shall (and shall cause any Manager that is not a Credit Party) to cooperate with Agents in connection with the same, and (y) Credit Parties, upon demand by either Agent, shall take (and shall cause any Manager that is not a Credit Party to take) any action necessary or desirable, in Agents' sole judgment, to permit Agents or their designee (including a replacement operator of any Healthcare Facility) to use, operate and maintain any Healthcare Facility for its current use. If any Credit Party fails to comply with the provisions of this paragraph (iii) for any reason, such Credit Party, to the extent permitted by applicable law, hereby irrevocably appoints Agents and their designees as such Credit Party's attorneys-in-fact, with full power of substitution, to take any action and execute any documents and instruments necessary or desirable in Agents' sole judgment to permit Agents or their designees to undertake such Credit Party's obligations under this paragraph (iii), including obtaining any Healthcare Authorizations or Governmental Authorizations then required for the operation of any Healthcare Facility by either Agent or either Agent's designee for its

current use. The foregoing power of attorney is coupled with an interest and is irrevocable, and either Agent may exercise its rights thereunder in addition to any other remedies which Agents may have against any Credit Party as a result of any Credit Party's breach of the obligations contained in this Section 12(n).

13.　NEGATIVE COVENANTS.

Until payment and satisfaction in full of all Obligations and termination of this Agreement, unless Credit Parties obtain Requisite Lenders' prior written consent waiving or modifying any of Credit Parties' covenants hereunder in any specific instance, each Credit Party agrees as follows:

(a)　Indebtedness. No Credit Party shall, nor shall it permit any Subsidiary to, create, incur, assume or become obligated (directly or indirectly), for any Indebtedness other than the Loans and other Obligations, except that it may (i) maintain its present Indebtedness listed on Schedule 11(n) hereto; (ii) incur purchase money Indebtedness or Capital Lease Obligations in connection with Capital Expenditures permitted pursuant to Section 14; (iii) a Borrower may incur Indebtedness consisting of one or more intercompany loans made to such Borrower by another Credit Party, provided that such Indebtedness shall be evidenced by a demand note (which may cover all such loans to such Borrower by such Credit Party) in form and substance reasonably satisfactory to the Agents and pledged and delivered to the Agents pursuant to the Loan Documents as additional collateral security for the Obligations, and, if requested by any Agent, the obligations under such demand note shall be subordinated to the Obligations in a manner satisfactory to the Agent; (iv) the SN Claim; and (v) the Bankruptcy Claims. No Credit Party shall, nor shall it permit any Subsidiary to, make any direct or indirect payment or prepayment, in cash, in kind, or otherwise, with respect to any Subordinated Debt; provided that Credit Parties may make regularly scheduled payments on account of the Bankruptcy Subordinated Debt in accordance with the Bankruptcy Plan of Reorganization so long as (1) no Default or Event of Default shall have occurred prior to, or would occur as a result of, any such payment and (2) Agents receive from Borrower Representative at least fifteen (15) days' advance written notice of each proposed payment, together with sufficient documentation of Borrower Representative's calculations to enable Agents to verify to their reasonable satisfaction that the proposed payment meets all the requirements of, and does not exceed the amount permitted under, this paragraph.

(b)　Liens. No Credit Party shall, nor shall it permit any Subsidiary to, grant or permit to exist (voluntarily or involuntarily) any Lien on any of its assets, other than Permitted Liens.

(c)　Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business. No Credit Party shall, nor shall it permit any Subsidiary to, (i) enter into any Acquisition (other than the Pascagoula Acquisition provided that each of the conditions set forth in Section 2(c) shall have been satisfied); (ii) change the state of its organization or enter into any transaction which has the effect of changing its state of organization; (iii) except as expressly permitted herein, sell, lease or otherwise dispose of any of its assets other than in the ordinary course of business; or (iv) except as expressly permitted herein, enter into any other transaction outside the ordinary course of its business, including,

55

without limitation, any purchase, redemption or retirement of any shares of any class of its Equity Interests, and any issuance of any shares of, or warrants or other rights to receive or purchase any shares of, any class of its Equity Interests. No Credit Party shall, nor shall it permit any Subsidiary to, form any Subsidiaries or enter into any joint ventures or partnerships with any other Person.

(d)     Dividends and Distributions. No Credit Party shall, nor shall it permit any Subsidiary to, declare or pay any dividend or other distribution (whether in cash or in kind) on any class of its Equity Interests, provided that, any wholly-owned Subsidiary of a Borrower may pay dividends or distributions to any Borrower or another wholly-owned Subsidiary of a Borrower. Notwithstanding the foregoing, (i) Borrowers may make distributions to the Manager permitted by Section 13(j) and (ii) with respect to each Estimated Tax Period during which NESI is an S corporation for United States federal income tax purposes, Borrowers shall be entitled to make distributions to NESI and NESI shall be shall be entitled to make distributions to its shareholders relating to the United States federal and state income taxes arising out of Borrowers' operations in an amount which, when added to all prior distributions made pursuant to this paragraph, does not exceed the Aggregate Tax Amount for all Estimated Tax Periods, provided that: (A) no Default or Event of Default is in existence at the time of the distribution or would occur as a result of such distribution; (B) Borrowers shall have Excess Availability of at least $250,000 after giving effect to the proposed payment; (C) Agents receive from Borrower Representative at least fifteen (15) days' advance written notice of each proposed distribution, together with sufficient documentation of Borrower Representative's calculations to enable Agents to verify to their reasonable satisfaction that the proposed distribution meets all the requirements of, and does not exceed the amount permitted under, this paragraph; and (D) the distribution is made not earlier than fifteen (15) days before the first to occur of the estimated tax payment date relating to income earned during such Estimated Tax Period and the due date for the tax return relating to the Estimated Tax Period. For purposes of this Section 13(d), the following definitions shall have the following meanings: (1) "Aggregate Tax Amount" means, with respect to any Credit Party, the product of (x) the Deemed Tax Rate multiplied by (y) the total of all items of taxable income or gain of such Credit Party allocated or estimated to be allocated to such Credit Party's shareholders, members or partners, as applicable, for all Estimated Tax Periods minus all items of deduction, loss and loss equivalent of tax credit allocated or estimated to be allocated by such Credit Party to its shareholders, members or partners, as applicable, for all Estimated Tax Periods; (2) "Deemed Tax Rate" means, for any Estimated Tax Period, the sum of the highest United States federal individual rates and Mississippi individual rates (but with such federal tax rate adjusted for the deductibility of state income taxes) in effect during such Estimated Tax Period; and (3) "Estimated Tax Period" means one of the following periods: January 1 to March 31, April 1 to May 31, June 1 to August 31 and September 1 to December 31, commencing with the first such period that ends on or after the date hereof.

(e)     Investments; Loans. No Credit Party shall, nor shall it permit any Subsidiary to, purchase or otherwise acquire, or contract to purchase or otherwise acquire, the obligations of or Equity Interests issued by any Person, other than direct obligations of the United States, obligations insured by the Federal Deposit Insurance Corporation and obligations unconditionally guaranteed by the United States; no Credit Party shall, nor shall it permit any Subsidiary to, lend or otherwise advance funds to any Person except for (i) advances made to

56

employees, officers and directors for travel and other expenses arising in the ordinary course of business and (ii) intercompany loans and advances constituting Indebtedness permitted under Section 13(a).

    (f)    Fundamental Changes, Line of Business. No Credit Party shall, nor shall it permit any Subsidiary to, enter into a new line of business materially different from its current business or change its Fiscal Year. No Credit Party shall, nor shall it permit any Subsidiary to, amend or otherwise modify any of its organizational documents in any way that could reasonably be expected to be adverse to either Agent or any Lender, and provided that, Agents have received not less than thirty (30) days' prior written notice of any such action.

    (g)    Equipment. No Credit Party shall (i) permit any Equipment to become a Fixture to Real Property unless such Real Property is owned by it and is subject to a Mortgage in favor of Agents or, if such Real Property is leased, is subject to a landlord's agreement in favor of Agents on terms acceptable to Agents, or (ii) permit any Equipment to become an accession to any other personal property unless such personal property is subject to a first priority Lien in favor of Agents.

    (h)    Affiliate Transactions. Except as set forth on Schedule 11(i) hereto, no Credit Party shall, nor shall it permit any Subsidiary to, conduct, permit or suffer to be conducted, transactions with Affiliates other than transactions for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to it than the terms upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate.

    (i)    Settling of Accounts. No Borrower shall settle or adjust any Account identified by a Borrower as an Eligible Account or with respect to which the Account Debtor is an Affiliate without the consent of Revolving Loan Administrative Agent, provided, that following the occurrence and during the continuance of an Event of Default, no Borrower shall settle or adjust any Account without the consent of Revolving Loan Administrative Agent.

    (j)    Compensation; Management Fees. No Credit Party shall, nor shall it permit any Subsidiary to, pay annual aggregate compensation, whether as salary, bonus or otherwise, to all of its directors or officers in excess of one hundred ten percent (110%) of the aggregate compensation, whether as salary, bonus or otherwise, to all of its directors, and officers in effect on the date of this Agreement for the first year and one hundred ten percent (110%) of the prior year's aggregate compensation amount for each subsequent year. The aggregate annual compensation amount(s) shall be adjusted each year for the net addition or loss of directors or officers. No Credit Party shall, nor shall it permit any Subsidiary to, make any direct or indirect payment or prepayment, in cash, in kind, or otherwise, with respect to any management, advisory or similar fees except regularly scheduled payments of management fees to the Manager as set forth in the Management Agreements, as in effect on the date hereof, in the form provided to Agents prior to the Closing Date, so long as (1) no Default or Event of Default shall have occurred prior to, or would occur as a result of, any such payment, and (2) Agents receive from Borrower Representative at least fifteen (15) days' advance written notice of each proposed payment, together with sufficient documentation of Borrower Representative's

57

calculations to enable Agents to verify to their reasonable satisfaction that the proposed payment meets all the requirements of, and does not exceed the amount permitted under, this paragraph.

(k) Other Agreements. No Credit Party shall, nor shall it permit any Subsidiary to, amend or otherwise modify, or waive any rights under, any Subordinated Debt Documents if, in any case, such amendment, modification or waiver could be adverse to the interests of the Lenders.

(l) Billing Services Agreement and Computer Back-Up Agreement. No Credit Party shall, nor shall it permit any Subsidiary to, terminate or amend any Billing Services Agreement other than in the ordinary course of business, or terminate or amend any outside service agreement for daily back-up of Accounts and other computer records without the prior written consent of Revolving Loan Administrative Agent, which consent shall not be unreasonably withheld.

(m) Dormant Subsidiaries. No Credit Party shall permit any Dormant Company to engage in any business, maintain any assets or liabilities or receive any proceeds of any Loans.

14. FINANCIAL COVENANTS. Until payment and satisfaction in full of all Obligations and termination of this Agreement, unless Credit Parties obtain Requisite Lenders' prior written consent waiving or modifying any of Credit Parties' covenants hereunder in any specific instance, each Credit Party agrees to maintain and keep in full force and effect each of the financial covenants set forth below:

(a) Consolidated Tangible Net Worth. Credit Parties shall maintain Consolidated Tangible Net Worth as of the end of each fiscal quarter of not less than the sum of (a) ($5,874,084.25) plus (b) 75% of positive Consolidated Net Income earned in each fiscal quarter by Credit Parties and their Subsidiaries beginning with the fiscal quarter ending December 31, 2006.

(b) Senior Debt Service Coverage. Credit Parties shall not permit the ratio of Consolidated EBITDA to Consolidated Senior Debt Service, as of the last day of each fiscal quarter for the twelve (12) month period ending on such date, commencing with the fiscal quarter ending December 31, 2006, to be less than 1.5 to 1.0.

(c) Total Debt Service Coverage Ratio. Credit Parties shall not permit the ratio of Consolidated EBITDA to Consolidated Total Debt Service for the period set forth below (tested as of the last day of each such period) to be less than the ratio set forth below for the corresponding period set forth below:

| Period | Ratio |
|---|---|
| For the 12 month period ending on December 31, 2006 | 1.0: 1.0 |

| | |
|---|---|
| For the 12 month period ending on March 31, 2007 | 1.0: 1.0 |
| For the 12 month period ending on June 30, 2007 | 1.0: 1.0 |
| For the 12 month period ending on September 30, 2007 and each twelve (12) month period ending on the last day of each fiscal quarter thereafter | 1.25: 1.0 |

(d) <u>Leverage</u>. Credit Parties shall not permit the ratio of Consolidated Senior Indebtedness to Consolidated EBITDA, as of the last day of each fiscal quarter for the twelve (12) month period ending on such date, commencing with the fiscal quarter ending December 31, 2006, to exceed 3.0 to 1.0.

(e) <u>Capital Expenditure Limitations</u>. Credit Parties shall not, nor shall they permit their Subsidiaries to, make any Capital Expenditures if, after giving effect to such Capital Expenditure, the aggregate cost of all such fixed assets purchased or otherwise acquired by Credit Parties and their Subsidiaries, on a consolidated basis, would exceed $650,000 during any Fiscal Year.

(f) <u>Operating Lease Obligations</u>. Credit Parties shall not, nor shall they permit their Subsidiaries to, incur operating lease obligations requiring payments by Credit Parties and their Subsidiaries, on a consolidated basis, in excess of $9,500,000 in the aggregate during any Fiscal Year.

(g) <u>Cash Velocity</u>. Credit Parties shall not permit the consolidated collections on Borrowers Accounts to be less than $6,000,000 during each calendar month, measured as of the last day of each month, commencing with the month ended October 31, 2006.

(h) <u>Minimum Census</u>. Credit Parties shall not permit the average combined census level at the facilities owned, operated or leased by Borrowers to be less than 75%, measured as of the last day of each month, commencing with the month ended October 31, 2006.

15. DEFAULT.

The occurrence of any one or more of the following events shall constitute an "**Event of Default**" by Credit Parties hereunder:

(a) <u>Payment</u>. The failure of any Obligor to pay when due, declared due, or demanded by Requisite Lenders, any of the Obligations.

(b) <u>Breach of This Agreement and the Other Agreements</u>. The failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under this Agreement or any of the Other Agreements; provided that any such failure by Credit Parties under Section 12(b) of this Agreement shall not constitute an Event of Default hereunder until the tenth (10th) day following the occurrence thereof.

(c) **Breaches of Other Obligations.** The failure of Obligor to pay when due or within any applicable grace period any obligation of Obligor in excess of $25,000 (other than its Obligations under this Agreement) for the payment of Indebtedness, or the becoming due and payable, or declaration to be due and payable, of such obligation before the expressed maturity of the obligation, or the occurrence of an event that, with the giving of notice or lapse of time, or both, would cause any such obligation to become, or allow any such obligation to be declared to be, due and payable.

(d) **Breach of Representations and Warranties.** The making or furnishing by any Obligor to either Agent or any Lender of any representation, warranty, certificate, schedule, report or other communication within or in connection with this Agreement or the Other Agreements, or in connection with any other agreement among such Obligor, either Agent and/or any Lender which is untrue or misleading in any material respect as of the date made.

(e) **Loss of Collateral.** The loss, theft, damage or destruction of any of the Collateral in an amount in excess of $50,000 in the aggregate for all such events during any year of the Revolving Loan Term as determined by Agents in their sole discretion, determined in good faith, or (except as permitted hereby) sale, lease or furnishing under a contract of service of, any of the Collateral.

(f) **Levy, Seizure or Attachment.** The making or any attempt by any Person to make any levy, seizure or attachment upon any of the Collateral.

(g) **Bankruptcy or Similar Proceedings.** The commencement of any proceedings in bankruptcy by or against any Obligor or for the liquidation or reorganization of any Obligor, or alleging that such Obligor is insolvent or unable to pay its debts as they mature, or for the readjustment or arrangement of any Obligor's debts, whether under the Bankruptcy Code or under any other law, whether state or federal, now or hereafter existing, for the relief of debtors, or the commencement of any analogous statutory or non-statutory proceedings involving any Obligor; provided, however, that if such commencement of proceedings against such Obligor is involuntary, such action shall not constitute an Event of Default unless such proceedings are not dismissed within forty-five (45) days after the commencement of such proceedings.

(h) **Appointment of Receiver.** The appointment of a receiver or trustee for any Obligor, for any of the Collateral or for any substantial part of any Obligor's assets or the institution of any proceedings for the dissolution, or the full or partial liquidation, or the merger or consolidation, of any Obligor that is a corporation, limited liability company or a partnership; provided, however, that, if such appointment or commencement of proceedings against such Obligor is involuntary, such action shall not constitute an Event of Default unless such appointment is not revoked or such proceedings are not dismissed within forty-five (45) days after the commencement of such proceedings.

(i) **Judgment.** The entry of any judgments or orders aggregating in excess of $50,000 against any Obligor that remain unsatisfied or undischarged and in effect for thirty (30) days after such entry without a stay of enforcement or execution.

(j) <u>Death or Dissolution of Obligor</u>. The death of any Obligor who is a natural Person, or of any general partner who is a natural Person of any Obligor that is a partnership, or any member who is a natural Person of any Obligor that is a limited liability company or the dissolution of any Obligor that is a partnership, limited liability company, corporation or other entity.

(k) <u>Default or Revocation of Guaranty or Collateral Document</u>. The occurrence of an event of default under, or the revocation or termination of, any agreement, instrument or document executed and delivered by any Person to either Agent or any Lender pursuant to which such Person has guaranteed to either Agent and Lenders the payment of all or any of the Obligations or has granted either Agent a Lien upon some or all of such Person's real and/or personal property to secure the payment of all or any of the Obligations.

(l) <u>Criminal Proceedings</u>. The institution in any court of a criminal proceeding against any Obligor that would have a Material Adverse Effect on such Obligor, or the indictment of any Obligor for any crime other than vehicle tickets and misdemeanors not punishable by jail terms.

(m) <u>Change of Control</u>. The failure of (i) Douglas M. Wright, Jr. to own and have voting control of at least one hundred percent (100%) of the issued and outstanding voting Equity Interests of NESI, the RCI Entities and Pascagoula Inc., (ii) NESI to own and have voting control of at least one hundred percent (100%) of the issued and outstanding voting Equity Interests of CLC and Manager, or (iii) CLC to own and have voting control of at least one hundred percent (100%) of the issued and outstanding voting Equity Interest of each of the remaining Borrowers.

(n) <u>Change of Management</u>. If (A) Douglas M. Wright, Jr. shall cease to be (i) the president of NESI or (ii) the managing member of each of the other Borrowers at any time, or (B) Troy Baumann shall cease to be the Chief Operating Officer of NESI at any time.

(o) <u>Material Adverse Change</u>. Any material adverse change in the Collateral, business, property, assets, prospects, operations or condition, financial or otherwise of any Obligor, as determined by Agents in each Person's sole judgment or the occurrence of any event which, in each Agent's sole judgment, could have a Material Adverse Effect.

(p) <u>Government Reimbursement Program Survey Deficiencies</u>. Regardless of whether or not any Credit Party had the power to control the operations of the application location and regardless of whether the same does or does not constitute a default under the applicable lease of such location, there shall occur with respect to any business location operated by any Credit Party any Medicare or Medicaid survey deficiencies at Level G, H, I, J, K, L or worse (i) which remain outstanding for a period greater than one (1) month and not subject to a plan of correction that has been accepted in writing by the applicable Governmental Authority or (ii) resulting in the imposition by any Governmental Authority or the applicable state survey agency of sanctions in the form of either a program termination, temporary management, denial of payment for new admissions, state monitoring or facility closure;

(q)    Healthcare Authorizations. A Governmental Authority shall have revoked any Healthcare Authorization of any Credit Party that results in the cessation of business, or the eligibility of any business for reimbursement under any Government Reimbursement Program, regardless of whether such Governmental Authorization was held by or originally issued for the benefit of any Credit Party, a tenant or any other Person; and/or

(r)    Lockbox Account Instructions. Any instruction or agreement regarding a Governmental Account Debtor Lockbox Account, Account Debtor Collection Lockbox Account, or related lockbox is amended or terminated without the written consent of Agents, or if any Borrower fails, within five (5) Business Days of receipt, to forward proceeds of Accounts to the applicable lockbox account, or if any Borrower directs any Account Debtor to make a payment in respect of any such Account to any place or account other than the applicable Governmental Account Debtor Lockbox Account, Account Debtor Collection Lockbox Account or Lockbox and such directions are not reversed within five (5) Business Days.

(s)    Termination of Payor Agreement. A termination of the contract with any Payor that represents a material portion of any Credit Party's Accounts.

(t)    Failure to Maintain Third-Party Payroll Tax Service Provider. The failure to maintain a contractual relationship with a payroll tax service provider, acceptable to Agents, at any time.

(u)    Subordinated Debt Documents. Any default or event of default shall occur and not be cured within any applicable grace period under any of the Subordinated Debt Documents, any subordination or intercreditor provision in any Subordination Agreement or in any document or instrument governing Subordinated Debt, shall cease to be in full force and effect, or any Credit Party or any other Person (including the holder of any applicable Subordinated Debt) shall contest in any manner the validity, binding nature or enforceability of any such provision.

(v)    Failure to Comply with the Terms of the Bankruptcy Order. Any Borrower fails to comply with the terms of the Bankruptcy Order or the Bankruptcy Plan of Reorganization described therein, or any "Triggering Event" (as defined in the Bankruptcy Plan of Reorganization) shall have occurred.

16.    REMEDIES UPON AN EVENT OF DEFAULT.

(a)    Upon the occurrence and during the continuance of an Event of Default described in Section 15(g) or (h) hereof, all of the Commitments shall immediately and automatically terminate and all of the Obligations shall immediately and automatically become due and payable, in each case, without notice of any kind. Upon the occurrence of any other Default or Event of Default, at the option of Requisite Lenders, and without demand, notice or legal process of any kind, all of the Commitments may be terminated and all of the Obligations may be declared, and immediately shall become, due and payable.

(b)    Upon the occurrence and during the continuance of a Default or an Event of Default, either Agent may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code and any other applicable law in addition to, and not in lieu

of, any rights and remedies expressly granted in this Agreement or in any of the Other Agreements and all of Agents' rights and remedies shall be cumulative and non-exclusive to the extent permitted by law. In particular, but not by way of limitation of the foregoing, either Agent may, without notice, demand or legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which it already has possession), wherever it may be found, and for that purpose may pursue the same wherever it may be found and, may enter onto any of Credit Parties' premises where any of the Collateral may be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of, and Agents shall have the right to store the same at any of Credit Parties' premises without cost to either Agent or any Lender. At Agents' request, Credit Parties shall, at Credit Parties' expense, assemble the Collateral and make it available to Agents at one or more places to be designated by Agents and reasonably convenient to Agents and Credit Parties. Credit Parties recognize that if any Credit Party fails to perform, observe or discharge any of its Obligations under this Agreement or the Other Agreements, no remedy at law will provide adequate relief to Agents and Lenders, and agrees that Agents and Lenders shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. Any notification of intended disposition of any of the Collateral required by law will be deemed to be a reasonable authenticated notification of disposition if given at least ten (10) days prior to such disposition and such notice shall (i) describe Agents and Credit Parties, (ii) describe the Collateral that is the subject of the intended disposition, (iii) state the method of the intended disposition, (iv) state that Credit Parties are entitled to an accounting of the Obligations and state the charge, if any, for an accounting and (v) state the time and place of any public disposition or the time after which any private sale is to be made. Agents and Lenders may disclaim any warranties that might arise in connection with the sale, lease or other disposition of the Collateral and have no obligation to provide any warranties at such time. Any Proceeds of any disposition by Agents and Lenders of any of the Collateral may be applied by Agents and Lenders to the payment of expenses in connection with the Collateral, including, without limitation, legal expenses and reasonable attorneys' fees, and any balance of such Proceeds may be applied by Agents and Lenders toward the payment of such of the Obligations, as set forth in Section 5(c).

17.  CONDITIONS PRECEDENT.

 (a)  Conditions Precedent to Initial Loans. The obligation of Agents and Lenders to fund the Term Loans and fund the initial Revolving Loan, and to issue or cause to be issued the initial Letter of Credit, is subject to the satisfaction or waiver on or before the date hereof, of the following conditions precedent (except in respect of those requirements that are set forth in a Post-Closing Agreement dated as of the Closing Date among Agents and Credit Parties):

  (i)  Agents shall have received each of the agreements, opinions, reports, approvals, consents, certificates and other documents set forth on the closing document list attached hereto as Exhibit C (the "**Closing Document List**") in each case in form and substance satisfactory to Agents (with such number of originals or copies as required by Agents) executed by Credit Parties and other required Persons, as applicable;

(ii) Agents shall have received such financial statements, reports, certifications, and other operational information required to be delivered under this Agreement, including without limitation an initial Borrowing Base Certificate calculating the Revolving Borrowing Base Amount;

(iii) All of the obligations of Credit Parties to Prior Lender as in effect immediately prior to the Closing Date will be performed and paid in full from the proceeds of the initial advances under the initial Loans on the Closing Date, and all Liens of any such Prior Lender on any property of any Credit Party in respect thereof will be terminated immediately upon such payment;

(iv) Agents shall have received evidence satisfactory to it that the insurance policies required under Section 12(e) are in full force and effect, together with written evidence showing lender's loss payable or additional insured clauses or endorsements in favor of Agents as required under such section;

(v) Since June 30, 2006, no event shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect on any Obligor, as determined by each Agent in its sole discretion, determined in good faith;

(vi) Agents shall have received payment in full of all fees and expenses payable to it by Borrowers or any other Person in connection herewith, on or before disbursement of the initial Loans hereunder, including, without limitation, payment of all underwriting fees in accordance with customary practices of Agents;

(vii) Agents shall have determined that immediately after giving effect to (A) the making of the initial Loans, and (B) the payment of all fees due upon such date and (C) the payment or reimbursement by Borrowers of Agents for all closing costs and expenses incurred in connection with the transactions contemplated hereby, Borrowers have Excess Availability of not less than Seven Hundred Fifty Thousand Dollars ($750,000);

(viii) Agents shall have determined that Credit Parties have Consolidated EBITDA (determined for the prior twelve-month period) of at least $4,100,000;

(ix) Agents shall have reviewed the results of, and found such results acceptable, in each Person's sole discretion, a takedown audit including verification of payment of all due and owing taxes (including, without limitation, pre-petition taxes owing to the Internal Revenue Service);

(x) Each Agent shall have reviewed the results of, and found such results acceptable, in its sole discretion, a healthcare regulatory compliance audit;

(xi) Agents shall have received the Guaranty of Douglas M. Wright, Jr.;

(xii) Each Agent shall have reviewed and found acceptable, in its sole discretion, all healthcare regulatory matters affecting Credit Parties and the Accounts,

64

including, without limitation: copies of all Medicare and Medicaid cost reports and audit reports for the last three (3) years, and information as to whether any cost reports of any Credit Party (under previous ownership or otherwise) have been audited by the relevant Governmental Authority, (ii) copies of the most recent Department of Health Survey and Plan of Corrections Reports, and (iii) evidence of compliance with healthcare-related laws and licensure for the operation of each facility of Credit Parties including, without limitation, certificates of need, evidence of licensure, and evidence of JCAHO accreditation;

(xiii) There is no material default in any obligations of any Credit Party under any contract to which such Credit Party is a party;

(xiv) Each Credit Party shall be in compliance with all applicable laws;

(xv) Each Borrower shall have established and maintained in its name all Lockboxes as set forth in Section 8 to the satisfaction of Agents and each Borrower shall have delivered to Agents, with respect to each Deposit Account maintained by such Borrower, a deposit account control agreement or blocked account agreement, as required by Agents, in form and substance satisfactory to the Agents, executed by the financial institution at which such Deposit Account is maintained;

(xvi) Each Credit Party shall have delivered all due diligence materials to Agents as Agents have requested;

(xvii) Agents shall have reviewed general background verifications of select principals, officers and directors of each Credit Party;

(xviii) Agents shall have received an executed Collection Custodial Agreement from an Authorized Officer of Credit Parties in form and substance acceptable to Agents;

(xix) Agents shall have received satisfactory evidence that Credit Parties have secured the services of a third-party payroll tax service provider;

(xx) Agents shall have received each of the Mortgages with respect to all of Credit Parties' and RCI Entities' Real Property locations as required by Agents, together with such title, survey, environmental and appraisal reports required by Agents.

(xxi) Agents shall have received satisfactory evidence, in their sole discretion, that (i) all payroll tax obligations of Credit Parties then due and payable have been satisfied fully and (ii) the Internal Revenue Service has accepted such payment and payment in full and not filed a Lien against the Collateral;

(xxii) Agents shall have received from each Obligor (other than a Credit Party) financial statements and tax returns for the prior two years in form and substance acceptable to Agents;

(xxiii) Agents shall have received evidence satisfactory to Agents from Credit Parties' third-party payroll tax service provider that payroll taxes then due and owing have been paid; and

(xxiv) Agents shall have received an order (the "**Bankruptcy Order**") of the Bankruptcy Court, in form and substance acceptable to Revolving Loan Administrative Agent in its sole discretion, which shall be in full force and effect and not stayed, reversed, vacated or otherwise modified on or before the Closing Date, and the Bankruptcy Order shall (i) authorize and approve this Agreement, including, without limitation, that the Lenders are extending credit to Borrower in good faith within the meaning of Bankruptcy Code Section 365(e), and approving all of each Agent's and each Lenders' fees and expenses provided herein, (ii) enter a court order (the "**Bankruptcy Confirmation Order**") confirming the Amended Joint Chapter 11 Plan of Reorganization of the Debtors, dated December 21, 2005 (the "**Bankruptcy Plan of Reorganization**") of the Borrowers, which Bankruptcy Plan of Reorganization, Bankruptcy Order and Confirmation Order shall each be in form and substance acceptable to the Agents in their sole discretion.

(b)    <u>Conditions Precedent to All Loans</u>. The obligation of Agent and Lenders to fund any Term Loan and any Revolving Loan, and to issue or cause to be issued each initial Letter of Credit, is subject to satisfaction or waiver on or before any such funding or issuance of the following conditions precedent:

(i)    All representations and warranties contained herein and in the Other Agreements shall be true and correct in all respects with the same effect as though such representations and warranties had been made on and as of the date of the making of each extension of credit and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date); and

(ii)    No Event of Default and no Default shall exist or have occurred and be continuing on and as of the date of, and after giving effect to, the making of such Loan or issuance of such Letter of Credit.

The request and acceptance by a Borrower of the proceeds of any Loan and issuance of each Letter of Credit shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by each Credit Party that the conditions in this <u>Section 17(b)</u> have been satisfied and (ii) a reaffirmation by each Credit Party of the granting and continuance of Agent's Liens and security interests, on behalf of Agent and Lenders.

18.    AGENTS.

(a)    <u>Appointment of Agents</u>.

(i)    Each Revolving Lender hereby designates Bridge Healthcare as Revolving Loan Administrative Agent to act as herein specified. Each Term Lender

66

hereby designates Bridge Opportunity as Term Loan Administrative Agent to act as herein specified. Each Lender hereby irrevocably authorizes such Agent to take such action on its behalf under the provisions of this Agreement and the notes and any other instruments and agreements referred to herein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agents by the terms hereof and thereof and such other powers as are reasonably incidental thereto. Except as otherwise provided herein, Agents shall hold all Collateral and all payments of principal, interest, fees, charges and expenses received pursuant to this Agreement or any of the Other Agreements for the benefit of Lenders. Agents may perform any of their duties hereunder by or through their agents or employees.

(ii) The provisions of this Section 18 are solely for the benefit of Agents and Lenders, and neither any Credit Party nor any other Obligor shall have any rights as a third-party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, each Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Obligor.

(b) Nature of Duties of Agents. Neither Agent shall have duties, obligations or responsibilities except those expressly set forth in this Agreement and the Other Agreements. Neither Agent nor any of such Person's officers, directors, employees or agents shall be liable for any action taken or omitted by it as such hereunder or in connection herewith, unless caused by its or their gross negligence or willful misconduct. The duties of Agents shall be mechanical and administrative in nature; Agents shall not have by reason of this Agreement or the Other Agreements a fiduciary relationship in respect of any Lender; and nothing in this Agreement or the Other Agreements, expressed or implied, is intended to or shall be so construed as to impose upon Agents any obligations in respect of this Agreement or the Other Agreements, except as expressly set forth herein.

(c) Lack of Reliance on Agents.

(i) Independently and without reliance upon Agents, each Lender, to the extent it deems appropriate, has made and shall continue to make (A) its own independent investigation of the financial or other condition and affairs of Agents, each Obligor and any other Lender in connection with the taking or not taking of any action in connection herewith, and (B) its own appraisal of the creditworthiness of Agents, each Obligor and any other Lender, and, except as expressly provided in this Agreement, neither Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter.

(ii) Neither Agent shall be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, collectibility, priority or sufficiency of this Agreement or the Other Agreements or any notes, or the financial or other

condition of any Obligor. Neither Agent shall be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or the Other Agreements, or the financial condition of any Obligor, or the existence or possible existence of any Event of Default.

(d) <u>Certain Rights of Agents</u>. Agents shall have the right to request instructions from Requisite Lenders or all Lenders, as applicable, pursuant to this Agreement, by notice to each Lender. If either Agent shall request instructions from Requisite Lenders or all Lenders, as applicable, with respect to any act or action (including the failure to act) in connection with this Agreement, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from Requisite Lenders or all Lenders, as applicable, and such Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Lender shall have any right of action whatsoever against either Agent as a result of such Agent acting or refraining from acting hereunder in accordance with the instructions of Requisite Lenders or all Lenders, as applicable.

(e) <u>Reliance by Agents</u>. Agents shall be under no duty to examine, inquire into, or pass upon the validity, effectiveness or genuineness of this Agreement, any of the Other Agreements or any instrument, document or communication furnished pursuant hereto or thereto or in connection herewith or therewith. Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order, electronic mail or other documentary, teletransmission or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person. Agents may consult with legal counsel (including counsel for any Obligor with respect to matters concerning any Obligor), independent public accountants and other experts selected by it, and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

(f) <u>Indemnification of Agents</u>. To the extent either Agent is not promptly reimbursed and indemnified by Credit Parties, each Lender will reimburse and indemnify such Agent, in proportion to its Pro Rata Share, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against either Agent in performing its duties hereunder, in any way relating to or arising out of this Agreement; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from either Agent's gross negligence or willful misconduct. If any indemnity furnished to either Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnities and cease to do, or not commence, the acts to be indemnified against, even if so directed by Requisite Lenders or all Lenders, as applicable, until such additional indemnification is provided. The obligations of Lenders under this <u>Section 18(f)</u> shall survive the payment in full of the Obligations and the termination of this Agreement.

(g) <u>Agents in Their Individual Capacity</u>. With respect to the Loans made by Agents pursuant hereto, each Agent shall have the same rights and powers hereunder as any